CARIBBEAN MILLS, INC., Appellant,

v.

Clayton S. KRAMER, Appellee.

No. 24090.

United States Court of Appeals
Fifth Circuit.

Jan. 26, 1968.

Rehearing En Banc Denied
March 5, 1968.

Morris Harrell, Stan McMurry, Rain, Harrell & Emery, Dallas, Tex., for appellant.

Jack Banner, Banner & McIntosh, Wichita Falls, Tex., for appellee.

Before BROWN, Chief Judge, and BELL and THORNBERRY, Circuit Judges.

THORNBERRY, Circuit Judge:

Because we conclude that the requisite diversity of citizenship does not exist in this case, it will not be necessary to recite the facts in great detail. Appellant, Caribbean Mills, Inc., is a foreign corporation organized under the laws of Haiti where it operates a flour mill. On May 30, 1959, it entered into a written agreement with a man named Kelly from Washington, D. C. and the Panama and Venezuela Finance Company, a foreign corporation organized under the laws of Panama. Under the terms of the agreement, appellant was to purchase from Panama 125 shares of corporate stock for a down payment of $85,000 plus installment payments amounting to an additional $165,000. Because of subsequent developments and appellant's interpretation of the contract in light of these developments, the installment payments were never made.

On September 21, 1964, Panama and Kelly assigned their interests under the 1959 contract to Clayton Kramer, an attorney in Wichita Falls, Texas and appellee here. The consideration was $1.00. By separate instrument executed on the same day, Mr. Kramer reassigned 95% of his newly acquired interest to Panama.[1] Thereafter, he filed suit against Caribbean Mills for $165,000 in the United States District Court for the Northern District of Texas.[2] The trial judge overruled appellant's motion to dismiss on jurisdictional grounds and proceeded to trial. The question of contract interpretation was submitted to a jury, which returned a verdict in favor of appellee for $165,000. In appealing the judgment entered on this verdict, Caribbean Mills urges, *inter alia*, that the sole purpose of the assignment from Panama to Kramer was to create diversity of citizenship under 28 U.S.C. § 1332(a) (2) (suit between citizen of a state and citizen of a foreign state) and that such a tactic brings into play 28 U.S.C. § 1359, which says that a federal court shall not have jurisdiction where a party "by assignment or otherwise, has been improperly or collusively made or joined to invoke the jurisdiction of such court." On oral argument before this Court, counsel for appellee made no particular effort to deny that Mr. Kramer is simply an assignee for purposes of collecting Panama's claim in federal court, but he argued that the assignment from Panama is valid on its face and that under the decided cases the motives for making it are of no import. Because we believe that 28 U.S.C. § 1359 has more force than appellee is willing to admit, we must reverse

1. Under the second instrument, Kramer had the right to pay his attorney 33⅓% of any recovery. He was to retain 5% of the remainder and pay Panama 95% as a "bonus."

2. There is no question that appellant had sufficient business contacts in Dallas, Texas to render itself amenable to process in the Northern District.

and remand with directions to dismiss for want of jurisdiction. While it may seem wasteful to divest the federal courts of jurisdiction after judgment has been entered on a jury verdict, there are deeper considerations which compel this result. In construing the very statute before us, the Tenth Circuit said,

> But, after all, it is the words of a federal statute we construe in the context of an historical purpose to deny diversity jurisdiction when it would operate to serve a purpose which is unsuited to the good order of federal court administration.

Bradbury v. Dennis, 10th Cir. 1962, 310 F.2d 73, 76.

## I.

■ By assigning its interest under the contract and obtaining a reassignment of 95% of that interest on the same day, Panama obviously intended to designate Kramer as a collection agent with the capacity to sue in federal court. To construe these transactions in another way would require serious departure from any traditional notion of reality. The question presented, then, is whether under Section 1359 an assignee for collection purposes can properly invoke federal jurisdiction. In our view, he cannot do so because the assignment to him was made for the purpose of creating federal jurisdiction without divesting the assignor of his interest in the lawsuit. To support this conclusion, we must delve into the history of Section 1359 and some of the old cases.

■ Broadly speaking, Section 11 of the Judiciary Act of 1789 denied federal jurisdiction to an assignee of a cause of action if it was unavailable to his assignor, i. e., if his assignor could not have brought the same suit in federal court. With changes in language, the "assignee clause" remained a part of the law until 1948. Wright, Federal Courts § 31, at 85 (1963 ed.). Section 37 of the Judicial Code of 1911, which stemmed from the Act of 1875, commanded the dismissal or remand of an original or removed action when the parties had been "improperly or collusively made or joined, either as plaintiffs or defendants, for the purpose of creating a case cognizable or removable." 3 J. Moore, Federal Practice ¶ 17.05, at 1319 (1967 ed.). In the 1948 Judicial Code, the Reviser condensed these two sections into Section 1359, the statute we have today. The Reviser's Notes indicate that the purpose of condensing the two sections into one was twofold: To eliminate confusing and unnecessary exceptions to the assignee clause and to eliminate the effect of that clause on bona fide assignees. Under the original clause, a bona fide assignee could not sue in federal court unless his assignor could have; under Section 1359, any assignee can sue in federal court so long as he was not improperly or collusively made a party in order to invoke federal jurisdiction. The Reviser's Notes do not suggest any other change in law or policy.

With this legislative background in mind, we turn to the pre-revision cases. These cases clearly reveal that the device employed by Panama would not have passed muster under pre-revision statutes. Williams v. Nottawa, 1881, 104 U.S. 209, 26 L.Ed. 719, involved an action against a township upon township bonds payable to bearer. Williams, the plaintiff, sued on three of the bonds as owner; but the rest of them had been transferred to him for collection purposes by citizens of Michigan, the state in which the township was located. The Supreme Court held that the transfer was colorable in the sense that it was never intended to change the ownership and was made only for the purpose of "creating a cause cognizable in the courts of the United States." The suit was therefore dismissed as being in contravention of the policy of the Act of 1875. The Reviser's Notes do not indicate that the policy of dismissing under these circumstances was changed by the enactment of Section 1359.

■ Two later cases following Williams v. Nottawa lend further support

to the principle that a federal court has no jurisdiction over an action brought by a collection agent to whom an assignment or transfer has been made for the purpose of creating diversity. In Southern Realty Investment Co. v. Walker, 1909, 211 U.S. 603, 29 S.Ct. 211, 53 L.Ed. 346, some Georgia attorneys had created a dummy corporation in South Dakota that was used as an agent to collect the claims of Georgia citizens against Georgia citizens in federal court. The Supreme Court held that under the Act of 1875 a diversity suit could not be maintained by the corporation in behalf of Georgia citizens. In Central Paper Co. v. Southwick, 6th Cir. 1932, 56 F.2d 593, Southwick had been assigned four claims for $1.00 each so that he could bring suit in federal court. He, like Mr. Kramer in the case at bar, appears to have arranged a fee for his efforts to collect. While it is not clear from the opinion that the reason for the assignments was to create diversity of citizenship, the court observed that the Act of 1875 and cases like Williams v. Nottawa prohibited "assignments of the technical legal titles to claims to plaintiffs for the purpose of permitting them to bring suits in federal courts for the purpose of collecting the same." 56 F.2d, at 596. It found the four assignments to be colorable or fictitious and hence improperly made to invoke federal jurisdiction.

The three cases just discussed are factually similar to the instant case and serve to demonstrate that courts interpreting the Act of 1875 considered an assignment for the purpose of enabling collection in federal court to be improper within the meaning of the statute. Three other cases, which are not so similar factually but perhaps more well-known, are illustrative of the same proposition. In Lehigh Mining & Mfg. Co. v. Kelly, 1895, 160 U.S. 327, 16 S.Ct. 307, 40 L.Ed. 444 and in Miller & Lux, Inc. v. East Side Canal & Irrigation Co., 1908, 211 U.S. 293, 29 S.Ct. 111, 53 L.Ed. 189, stockholders of one corporation transferred fee title in land to a sham corporation in another state without valuable consideration for the purpose of creating federal jurisdiction. In Miller & Lux, the Court summarized the transaction as follows:

* * * the transfer of the property of the California corporation to the Nevada corporation was merely formal,—only a device by which to have the rights asserted by the California corporation in a state court determined by the Federal court rather than by the state court. The agreement that all the property of the California corporation should be transferred to the Nevada corporation was attended by the condition that all the capital stock of the new corporation should be issued —and it was issued—to the California corporation, which remained in existence with full power, as the owner of such stock, to control the operations of the Nevada corporation.

211 U.S., at 304, 29 S.Ct., at 114. The Court held that the Nevada corporation was collusively made plaintiff in the suit for the purpose of creating federal jurisdiction and therefore that jurisdiction failed under the Act of 1875. The reason jurisdiction failed was not that the California corporation made a transfer with the motive of getting into federal court but rather that the transfer was colorable, indeed a sham, and was undertaken in order to create federal jurisdiction. In terms of the statute, the California corporation acted improperly or collusively to invoke jurisdiction of the court. We stress the importance of a colorable or fictitious transfer to the meaning of these cases because in Black & White Taxicab & Transfer Co v. Brown & Yellow Taxicab & Transfer Co., 1928, 276 U.S. 518, 48 S.Ct. 404, 72 L.Ed. 681, a very similar case, the Court made an often-quoted statement to the effect that it would not inquire into the motives behind the particular transfer. In that case, the Court found that the transfer was actual inasmuch as the transferor corporation had been dissolved. Having made this finding, it said the existence of a motive to create diversity jurisdiction by the transfer was not fatal.

■ The cases involving reincorporation in another state are relevant insofar as they show that the Act of 1875 and its successors to 1948 prohibited colorable transfers effected for the purpose of invoking federal jurisdiction. More to the point are the collection-agent cases, for they prove conclusively that under pre-revision law the arrangements between Panama and Kramer would not have invoked federal jurisdiction. The critical question for this Court, therefore, is whether Section 1359 of the 1948 Judicial Code changed the law. Although language in Corabi v. Auto Racing, Inc., 3d Cir. 1959, 264 F.2d 784, and City of Eufaula, Alabama v. Pappas, M. D. Alabama 1963, 213 F.Supp. 749, may imply that the law has changed, the correct answer must be that the law is the same today as it was in 1881 when Williams v. Nottawa was decided. The Reviser's Notes indicate that Section 1359 was designed to eliminate some of the defects of the assignee clause, but they do not reflect any change of policy with respect to the Act of 1875 and its successor statutes. While it might be argued that the revised section places greater emphasis on the fact that its application is limited to improper or collusive arrangements, the Reviser's Notes do not suggest a legislative intent to narrow the effect of court decisions previously discussed. In Fourco Glass Co. v. Transmirra Products Corp., 1957, 353 U.S. 222, 77 S.Ct. 787, 1 L.Ed.2d 786, the Supreme Court said that an alteration or condensation of a statute in 1948 did not change the law unless an intention to change was clearly expressed:

> Statements made by several of the persons having importantly to do with the 1948 revision are uniformly clear that no changes of law or policy are to be presumed from changes of language in the revision unless an intent to make such change is clearly expressed.

353 U.S., at 227, 77 S.Ct., at 790. This rule for interpreting the 1948 revision in light of pre-revision law was later reiterated by Justice Goldberg in Chambers. United States v. FMC Corporation, 1963, 84 S.Ct. 4, 7, 11 L.Ed.2d 20.

## II.

Appellee's reliance is not really on the argument that Section 1359 changed the law but rather is on the proposition that both the old statutes and the revised version have very narrow application. He points especially to the implication of the *Black & White Taxicab* case, supra, that a motive to create federal jurisdiction by reincorporating in another state did not contravene the Act of 1875. As was stated previously, the Court made this statement after having found that the transfer from one corporation to another was real and absolute. While it is true that *Black & White Taxicab* presents a conceptual problem in that the same people no doubt controlled both the dissolved corporation and the newly created one, it must nevertheless be inferred from the opinion that a critical distinction is to be made between actual and colorable transfers. In the instant case, the assignment was colorable in the sense that it did not divest Panama of its interest in the lawsuit. To repeat, Mr. Kramer, the assignee, is nothing but a collection agent who was not involved in and is not knowledgeable about the events leading up to the lawsuit and who has no interest in it aside from his fee. The thrust of *Lehigh Mining* and other cases discussed to this point is that an assignment of this kind made for the purpose of invoking federal jurisdiction is improper or collusive within the meaning of the statute.

■ Admittedly, we find some uncertainty in post-revision cases. In Bradbury v. Dennis, supra, for example, jurisdiction was sustained as against a contention that the assignment from an insolvent corporation to its nonresident sole stockholder was improper or collusive. Since the transfer was supported by adequate consideration and since there was nothing "surreptitious or fictitious" about it, the court felt that the proscription of Section 1359 was inapplicable. In Steinberg v. Toro, D.Puerto Rico 1951, 95 F.Supp. 791, on the other hand, the

court dismissed for want of jurisdiction because it considered an assignment from a Puerto Rican corporation to its president, director, and stockholder in New York to be improper. The transaction was found to lack reality:

> * * * it must be concluded that neither the Corporation or the plaintiff ever intended or considered that the assignment, if made, operated so as to completely divest the Corporation of all interest in and power of control over the contract or any rights under it. And the close identity that exists between the plaintiff and the Corporation is likewise convincing that the Corporation has a residual power of control over the contract or any rights under it which is inconsistent with the idea of a real and absolute assignment thereof to the plaintiff.

95 F.Supp., at 797. The court concluded that Congress did not intend to confer jurisdiction on federal courts in cases where diversity of citizenship is achieved by pretense. These cases are more difficult than the instant case because each of them involved an assignee with an interest in the company for which he prosecuted a claim in federal court. In neither case could it be said that the assignee was a mere collection agent who had never even been informed about the nature of the controversy. Despite this distinction, however, Bradbury v. Dennis seems difficult to reconcile with pre-revision cases such as *Lehigh Mining*. In *Bradbury*, a Colorado corporation assigned its claims to its nonresident stockholder in order to create diversity; yet it does not appear that the corporation was dissolved or that it really divested itself of any interest in the claims.[3]

While the assignment of a claim from corporation to nonresident stockholder presents a vexing problem, still more troublesome is the appointment of a foreign administrator or executor. In Corabi v. Auto Racing, Inc., supra, it was conceded that the resident administratrix had resigned in favor of a nonresident administrator for the sole purpose of creating diversity. The court upheld jurisdiction, saying that it was not prohibited by Section 1359.[4] The case is troublesome because it is difficult

---

3. As we have suggested, in a situation where a corporation, without giving up its interest, assigns a claim to a stockholder in order to create diversity, the proscription of Section 1359 should apply. A case of this kind should be distinguished from cases in which there is no assignment or other device employed to create diversity and in which the party filing suit has a substantial interest. In Matthies v. Seymour Mfg. Co., D. Conn.1958, 23 F.R.D. 64, for example, the court overruled an objection to jurisdiction based on Section 1359 because it found that the nonresident plaintiff, as owner of contingent interests in the two trusts involved, had a substantial stake in the litigation. The fact that one of his relatives had a greater interest and had underwritten the costs of litigation was not deemed controlling. The court found no evidence that the plaintiff had actually surrendered control over the conduct of the suit. Similar reasoning was used to sustain jurisdiction in a later case decided by the same court. See Allstate Ins. Co. v. Lumbermens Mut. Cas. Co., D.Conn.1962, 204 F.Supp. 83.

In Amar v. Garnier Enterprises, Inc., C.D.Calif.1966, 41 F.R.D. 211, the court dismissed a stockholders derivative suit on the ground that the plaintiff had been made a stockholder solely for the purpose of enabling him to bring a diversity derivative suit. He knew nothing about the suit and would have had no control over it. This case and Matthies v. Seymour Mfg. Co. appear to be correctly decided. In each, the court determined whether there had been an improper or collusive arrangement to secure federal jurisdiction by asking whether the nominal plaintiff had a substantial interest in the lawsuit or was just a stand-in for some nondiverse party.

4. Faced with almost identical facts, a number of courts have reached the same result as did the Third Circuit in *Corabi*. See, e. g., Lang v. Elm City Construction Co., 2d Cir. 1963, 324 F.2d 235; Todd County, Minn. v. Loegering, 8th Cir. 1961, 297 F.2d 470; Stephan v. Marlin Firearms Co., D.Conn.1963, 217 F.Supp. 880.

to argue with the result despite the fact that the real party in interest appointed a nonresident administrator for the single reason that she wanted the case to be tried in federal court. The result is supported by the rule that the decree of a state probate court naming an administrator cannot be collaterally attacked because of the purposes and motives of the parties when they practiced no fraud upon the court. Mecom v. Fitzsimmons Drilling Co., 1931, 284 U.S. 183, 52 S.Ct. 84, 76 L.Ed. 233. Since the *Mecom* case precluded a collateral attack in federal court on Mr. Corabi's appointment as administrator, the court had no basis for labeling that appointment as improper or collusive within the meaning of Section 1359.

Were it not for the court's discussion of the meaning of Section 1359, we would not dwell on the *Corabi* case but would simply distinguish it as involving an appointment immune from collateral attack. The problem is that the court defined "improper or collusive" so that the statute would have very narrow application, if any application at all:

> The statute uses the phrase "improperly or collusively" to characterize the manufacture or joinder prohibited by it. The word "collusion" is a strong one. The term "collusion" indicates "A secret agreement and cooperation for a fraudulent or deceitful purpose; deceit; fraud." Webster's New International Dictionary, 2 ed. * * * Certainly to make use of state law to obtain diversity jurisdiction even though the object may be a high verdict in federal court is not collusive within the ordinary meaning of that term. Moreover, the word "collusion" generally is employed to indicate an illegal agreement or understanding between opposing sides of a litigation rather than to an arrangement effected by one side of the sort at bar. Here the plaintiff's side of the case acted

for what it deemed to be its own benefit and was opposed heartily by the other party to the litigation. The terms "improper" or "improperly", according to Webster's mean "Not suited to the circumstances, design, or end; not appropriate, fit, or congruous; as an *improper* medicine; *improper* dress." Webster gives as synonyms: "Improper, indecent, unseemly, indecorous, unbecoming, indelicate." The word "improperly" clearly connotes impropriety. We cannot perceive that here. Had Congress intended to prohibit the creation of federal diversity jurisdiction under such circumstances as those at bar it could have done so simply by omitting the words "improperly or collusively".

264 F.2d, at 788. By focusing on the literal meanings of the two words, the court virtually emasculated the statute; for it is doubtful that any of the cases under consideration reflect collusion in the sense of fraud or deceit, collusion with the opposing party, or impropriety in the sense of indecorum or indecency. Indeed, when litigants can achieve diversity by such simple devices as assignment to a nonresident collection agent or appointment of a nonresident administrator, it is hard to imagine why they would ever resort to fraud or deceit, actual impropriety, or collusion with the other side. If the statute is to have any utility, its meaning must be derived from the pre-revision statutes and cases, not from dictionary definitions of the individual words. In the context of Section 1359 and its predecessor statutes, the phrase "improperly or collusively" means what the courts have said it means. Hence, an attempt to create federal jurisdiction by colorable assignment or other device without substance is "improper or collusive" within the meaning of the statute. This principle is settled by pre-revision cases and remains the law today.[5]

---

5. Cases like *Corabi* have prompted Professor Wright to observe that Section 1359 "has been largely ineffective." Wright, Federal Courts § 31, at 86 (1963 ed.). To remedy this situation, the American Law Institute has proposed two new sections for the Judicial Code. One of these would attribute the same

Like *Corabi*, *City of Eufaula*, Alabama v. Pappas, supra, evinces a restrictive view of Section 1359. In that case, the city instituted condemnation proceedings against a piece of land owned jointly by the members of a large family. The members who lived in Alabama transferred their interests to Zafero P. Paterson, the one member of the family who lived in another state. The consideration was $1.00, and it was conceded that the purpose of the transfer was to create diversity jurisdiction. Though there was no instrument requiring him to do so, it was understood that Paterson would share any sum he recovered in the suit with his transferors.[6] Despite the fact that he was clearly acting as the family's collection agent in federal court and had not received an absolute assignment of the other interests, the district court sustained jurisdiction, reasoning that a contract supported by $1.00 consideration is valid under Alabama law and that the motive to create federal jurisdiction is immaterial. We are unable to distinguish this case from the one before us, but we choose not to follow it. The assignment was colorable in the sense that it did not divest the assignors of their interests in the lawsuit, and it was made for the purpose of creating diversity. In our opinion, the decision upholding jurisdiction under these circumstances represents an unjustified departure from pre-revision cases decided by the Supreme Court and serves to undermine the historic policy of limiting diversity jurisdiction.[7]

As we are firmly convinced that the court below had no jurisdiction over the subject matter, we need not proceed to the merits of the controversy. The judgment of the district court is reversed and the cause remanded to that court with directions to dismiss for want of jurisdiction.

## ON PETITION FOR REHEARING EN BANC

### PER CURIAM:

The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, Rule 25(a), subpar. (b), the Petition for Rehearing En Banc is denied.

---

citizenship to an executor or administrator as the decedent, thus making it impossible to create diversity by appointment of a nonresident. ALI Study of the Division of Jurisdiction Between State and Federal Courts § 1301(b) (3) (April 1964 Draft). Section 1309(b) of the same Draft would clearly prohibit assignments or other transfers designed to create diversity jurisdiction:

> Whenever an object of a sale, assignment, or other transfer of the whole or any part of any interest in a claim or any other property has been to enable or to prevent the invoking of jurisdiction under this chapter or chapter 158 of this title, jurisdiction of a civil action shall be determined as if such sale, assignment or other transfer had not occurred. The word "transfer" as used in this section includes the appointment of a trustee, receiver, or other fiduciary, or of any other person to hold or receive interests of any kind, whether made by private persons or by a court or any other official body.

6. There appears to be no material distinction between this case and the instant case, but there is the minor distinction that Paterson did not execute a separate instrument stating that each member of the family would share in the recovery to the extent of his interest in the land. The parties simply had an understanding to this effect. The question arises whether we would decide the instant case differently if Kramer had not executed the instrument of reassignment. If it still appeared from all the facts that he was merely a collection agent and that the assignment was not real and absolute, then the result would, of course, be the same.

7. In Ferrara v. Philadelphia Laboratories, Inc., D.Vermont 1967, 272 F.Supp. 1000, a case involving an assignment of personal-injury claims to a nonresident trustee for the purpose of creating diversity, Judge Leddy discusses in a very thorough fashion the same decisions we have discussed in relation to Section 1359 and reaches substantially the same conclusions about them. The motion to dismiss for want of jurisdiction was granted.