Howard Wallace **BARBEE** and Bobby Joe Manziel, Appellants,

v.

**UNITED STATES** of America, Appellee.

No. 23822.

United States Court of Appeals Fifth Circuit.

Feb. 21, 1968.

Rehearing Denied March 19, 1968.
Certiorari Denied May 27, 1968.
See 88 S.Ct. 1849.

John D. Cofer, G. Hume Cofer, Douglass D. Hearne, Austin, Tex., James Byron Saunders, Saunders & Caldwell, Tyler, Tex., Cofer, Cofer & Hearne, Austin, Tex., for appellants; Thomas H. Nation, Austin, Tex., of counsel.

Wm. Wayne Justice, U. S. Atty., Tyler, Tex., Paul C. Summitt, Atty., Dept. of Justice, Fred M. Vinson, Jr., Asst. Atty.

Gen., Beatrice Rosenberg, Atty., U. S. Dept. of Justice, Washington, D. C., for appellee.

Before WISDOM, THORNBERRY and GOLDBERG, Circuit Judges..

GOLDBERG, Circuit Judge.

In 1963 Howard Wallace Barbee and Bobby Joe Manziel, then gullible and motivated by avarice, lost ten thousand dollars in a confidence racket. The memory of that hoax lingered with them, and two years later, still motivated by avarice, they sought to recoup their losses by instigating the same racket for their benefit. The only difference was that their intended victim notified the police, and Barbee and Manziel were arrested. They were convicted in a federal district court for illegal possession of altered currency in violation of 18 U.S.C. § 472, which currency had been the subject of their fraud. Their appeal, unlike many criminal cases that come before us, is not burdened with significant factual disputations. Barbee and Manziel admit the facts of their scheme and even concede that it may have been morally reprehensible. They contest merely its illegality.

The confidence racket which was employed in 1963 and in 1965 involves a "stir man," a genuine federal reserve note, an altered federal reserve note, and of course a "sucker." The "stir man" contacts a "sucker" and shows him a "counterfeit" reserve note which is an exact duplicate of a genuine note and which even experts would claim to be genuine. He guarantees that a revolutionary duplication process can be put in motion for quite a reasonable investment. To the "sucker's" dismay, after contributing his share of the investment, he learns that both reserve notes were genuine and that the only process performed had been the altering of serial numbers and other markings on one note to correspond with the other.

Two facets of this confidence racket concern us on appeal: (1) The "stir man" never intends to make counterfeit notes or even to pass the altered note. He uses the note only to get the "sucker's" investment. (2) The racket can succeed only if the "sucker" is willing to participate in an illegal counterfeiting scheme. We also note that Barbee and Manziel (appellants) were convicted under 18 U.S.C. § 472, *possession* of altered currency, rather than under 18 U.S.C. § 471, the act of *altering*. Nevertheless, though the facts be somewhat unconventional even in the world of counterfeiting, we hold that such facts are harbored by Section 472 and affirm.

Section 472 of the Criminal Code reads as follows:

"Whoever, with intent to defraud, passes, utters, publishes, or sells, or attempts to pass, utter, publish, or sell, *or with like intent* brings into the United States or *keeps in possession* or conceals any falsely made, forged, counterfeited, or altered obligation or other security of the United States, shall be fined not more than $5,000 or imprisonment not more than fifteen years, or both." (Emphasis added.)

The appellants ask us to read into the statute the dual requirement of intent to defraud and intent to pass; thus, they would have us interpret the statute as if it read as follows:

"Whoever, with intent to defraud, * * * [acts listed], or *with like intent to defraud by passing, uttering, publishing, or selling,* * * * keeps in possession * * * any * * * altered obligation or other security of the United States, shall be fined * * *." (Emphasis added.)

They would have us conclude that although they may have been guilty of swindling,[1] because of their lack of intent to pass the altered note, they did not commit a federal crime.

---

1. Their additional contention that it is impossible to swindle a dishonest man will be discussed infra.

The government, in response, asks us to interpret the statute as if it read as follows:

"Whoever, with intent to defraud, * * * [acts listed], or *with like intent to defraud in any manner using altered obligations,* * * * keeps in possession * * * any * * * altered obligation or other security of the United States, shall be fined * * * ." (Emphasis added.)

Under such a reading the appellants clearly would be guilty of violating Section 472.

Although there are no modifiers of the word "possession" in the statute, the appellants see in the evolutionary history of the statute the justification for their proposed construction. They admit that an addition must be made to the present words, but they claim such addition is required when we pollinate Section 472 with historical perspective. Before the present codification (enacted in 1948) the relevant statute read as follows:

18 U.S.C. § *265. (Criminal Code, section 151):*

"Uttering forged obligations.—Whoever, with intent to defraud, shall pass, utter, publish, or sell, or attempt to pass, utter, publish, or sell, or shall bring into the United States or any place subject to the jurisdiction thereof, *with intent to pass, publish, utter, or sell, or shall keep in possession or conceal with like intent,* any falsely made, forged, counterfeited, or altered obligation or other security of the United States, shall be fined not more than $5,000 and imprisoned not more than fifteen years." (1926) (codified from and using the exact same language as R.S. Sec. 5431; Mar. 4, 1909, c. 321, Sec. 151, 35 Stat. 1116) (Emphasis added.)

Moreover, the 1864 predecessor to Section 472 placed "intent to pass * * * "

even closer in the sentence structure to "possession":

"*Chap. CLXII.—An Act to provide Ways and Means for the Support of the Government, and for other Purposes.*

* * * * * *

"Sec. 10. And be it further enacted, that if any person or persons shall falsely make, forge, counterfeit, or alter, or cause or procure to be falsely made, forged, counterfeited, or altered, any obligation or security of the United States, or shall pass, utter, publish, or sell, or attempt to pass, utter, publish, or sell, or shall bring into the United States from any foreign place with intent to pass, utter, publish, or sell, *or shall have or keep in possession, or conceal, with intent to utter, publish, or sell,* any such false, forged, counterfeited, or altered obligation, or other security, with intent to deceive or defraud, or shall knowingly aid or assist in any of the acts aforesaid, every person so offending shall be deemed guilty of felony, and shall, on conviction thereof, be punished by fine not exceeding five thousand dollars, and by imprisonment and confinement at hard labor not exceeding fifteen years, according to the aggravation of the offence" (Emphasis added.)

Appellants' able counsel have traced the history of Section 472 in their brief and have skillfully demonstrated that in no revision from 1864 to 1948 has the "intent to pass" issue been expressly considered. In 1948 for example, the only relevant comment in the revisor's notes to Section 472 was the general statement, "changes in phraseology were made." [2] Moreover, in an introduction to that section-by-section analysis the revisors promised to "explain in detail every change made in text." [3] From such legislative history the appellants contend that the "intent to pass" requirement has remained in the statute in substance despite its terminological evanescence.

---

2. House Rep. No. 304, 80 Cong. 1948, 1st Sess., p. A 36.

3. Id. at p. 9.

We are urged to look to the old and wear blinders on the new because the new comes to us without the credentials of change. The predicate of this argument is that statutory revisions without explications ring in no change and that recodifications without exegetical words are no more than exercises in organized numerology. If we were to consider such predicate in a vacuum, we would find the existing authority somewhat equivocal.[4] However, in the case at bar, the old

---

4. When the meaning of a revised statute has been clear, courts have refused to consider any conflicts in revisionary history. United States v. Bowen, 1880, 100 U.S. 508, 25 L.Ed. 631; Continental Casualty Co. v. United States, 1942, 314 U.S. 527, 530, 62 S.Ct. 393, 86 L.Ed. 426, 430. See also United States v. State of Oregon, 1961, 366 U.S. 643, 648, 81 S.Ct. 1278, 6 L.Ed.2d 575, 579. Moreover, the general proposition that courts should not look past the words of a clear statute—often called the "plain meaning rule"—is a common judicial proposition. See, among numerous others, Malat v. Riddell, 1966, 383 U.S. 569, 571–572, 86 S.Ct. 1030, 16 L.Ed.2d 102, 104; C. I. R. v. Brown, 1965, 380 U.S. 563, 571–572, 85 S.Ct. 1162, 14 L.Ed.2d 75, 82; General Electric Co. v. Southern Construction Co., 5 Cir. 1967, 383 F.2d 135, 138–139; Minnesota Mining and Manuf. Co. v. Norton Co., 6 Cir. 1966, 366 F.2d 238, 242, cert. den., 1967, 385 U.S. 1005, 87 S.Ct. 711, 17 L.Ed.2d 544. On the other hand, when the meaning of a revised statute has been subject to doubt, courts have relied heavily on the revisors for guides to interpretation. Notable reliance on the *absence* of any specific revisor's comment can be found in Fourco Glass Co. v. Transmirra Products Corp., 1957, 353 U.S. 222, 227, 228, 77 S.Ct. 787, 1 L.Ed.2d 786, 789, 790; City of Greenwood, Mississippi v. Peacock, 1966, 384 U.S. 808, 816, 86 S.Ct. 1800, 16 L.Ed.2d 944, 950; Caribbean Mills, Inc. v. Kramer, 5 Cir. 1968, 392 F.2d 387. See also Ruth v. Eagle-Picher Co., 10 Cir. 1955, 225 F.2d 572, 575, and the numerous cases cited therein. Cf. Honed v. United States, 5 Cir. 1965, 344 F.2d 798.

We have found no conflict in the substance of the above cases. In fact, even their language, though often inconsistent as to emphasis, has been consistent in spirit. In 1880 when the Supreme Court installed the "plain meaning rule" as to a statutory revision, it said: "When the meaning is plain, the courts cannot look to the statutes which have been revised to see if Congress erred in the revision, but may do so when necessary to construe doubtful language used in expressing the meaning of Congress." United States v. Bowen, supra, 100 U.S. at 513–514, 25 L.Ed. 631. Four years later when the same court refused to reconsider the interpretation of a revised statute, it stated a proposition not inconsistent with the one in *Bowen:* "A change of phraseology in a revision will not be regarded as altering the law where it had been settled by plain language in the statutes, or by judicial construction thereof, unless it is clear that such was the intent. * * * Of course a change of phraseology which necessitates a change of construction will be deemed as intended to make a change in the law." McDonald v. Hovey, 1884, 110 U.S. 619, 629, 4 S.Ct. 142, 146, 28 L.Ed. 269, 272.

Unfortunately, however reasonable *Bowen, McDonald,* and their offspring may be, they continually beg an important issue. Whether or not the words of a statute are clear is itself not always clear. It could be contended perhaps that, because denotations and connotations in legal expression often defy the rules of logic and syntax, no statute has a "plain meaning." This view has not precipitated an abandonment of the "plain meaning rule," but courts have been willing to look behind otherwise clear language when a literal reading of a statute was inconsistent with its congressional purpose. United States v. Ivey, 5 Cir. 1961, 294 F.2d 799, 803; C. I. R. v. Kelley, 5 Cir. 1961, 293 F.2d 904, 912; Missouri Pac. Ry. Co. v. Austin, 5 Cir. 1961, 292 F.2d 415, 418.

The problem relevant to a provision such as Section 472 is an even narrower point. Assuming no conflict between words and purpose, to what extent can revisionary history make otherwise clear statutory language unclear and thus subject to further scrutiny? The cases cited in this footnote demonstrate two methodological approaches which in a laboratory situation could bring different results.

Although judicial resolution of the problems indicated above has been negligible, we can recommend at least one treatment that is as scholarly as it is exhaustive. Witherspoon, "Administrative Discretion to Determine Statutory Meaning: 'The High Road,'" 35 Texas L.Rev. 63 (1956); Witherspoon "Administrative Discretion to Determine Statutory Meaning: 'The

law without assistance from the new convicts the appellants. As we shall show, infra, there is no dissidence between the present wording of Section 472, the purpose of the statute, and its pre-1948 judicial interpretations.

The government does not establish services for the benefit of thieves. It does not wish to be an unwitting accessory in crime. Therefore, it has a valid interest in guarding against fraudulent misuse of its services, even if the fraud may never injure the government itself. For recent examples, see Bannister v. United States, 5 Cir. 1967, 379 F.2d 750 (conviction for use of mails in execution of a fraud); Barnett v. United States, 5 Cir. 1967, 384 F.2d 848, 854–855 (conviction for altering the dates of coins to make them "antiques"). Moreover, because attacks upon the physical integrity of currency in particular may endanger society by depleting the public trust in its economic standard, the government must establish sanctions to discourage such attacks. See United States v. Raynor, 1938, 302 U.S. 540, 58 S.Ct. 353, 82 L.Ed. 413.

These sanctions need not extend to all forms of fraud in the society where money is exchanged. Thus, the Supreme Court has held counterfeiting laws inapplicable to fraudulent transactions—even when counterfeit bills were exchanged—if the parties believed the currency to be valid. United States v. Carll, 1882, 105 U.S. 611, 26 L.Ed. 1135; Dunbar v. United States, 1895, 156 U.S. 185, 193, 15 S.Ct. 325, 39 L.Ed. 390, 393; Prussian v. United States, 1931, 282 U.S. 675, 678, 51 S.Ct. 223, 75 L.Ed. 610, 612–613. As stated in *Dunbar*, supra:

"The purpose of [the existing counterfeiting statute] is the protection of the bonds or currency of the United States, and not the punishment of any fraud or wrong upon individuals." 156 U.S. at 193, 15 S.Ct. at 528.

Nevertheless, the sanctions should be applied when the physical integrity of the currency is challenged in any way. As stated by our Court in Brooks v. United States, 5 Cir. 1935, 76 F.2d 871:

"The manifest object of the statute here involved is to protect against *all attempts at fraud* upon the genuine monetary obligations or securities of the United States." (Emphasis added.)

In 1935 the Tenth Circuit affirmed a conviction for a counterfeiting hoax almost exactly like the one at bar. We quote the Court's analysis in that case:

"The offense denounced by section 148, supra, is the alteration of an obligation of the United States with intent to defraud. *The alteration need not be one which destroys or impairs the validity of the obligation. It is enough if an alteration is made in furtherance of a scheme to defraud and it is not necessary that the United States be the intended or actual victim of the scheme.* An alteration made as a material part of a scheme to defraud any person comes within the terms of the statute. Crouch v. United States (C.C.A.) 298 F. 437. The test, therefore, is whether the alterations in question were material to a scheme to defraud. The scheme was to convince Billington that through a chemical and rolling process appellants were producing replicas of genuine $5 bills, to persuade him to furnish $2,500 in new bills of five, ten, and fifty dollar denominations under the pretext that they would make replicas and divide the profit, but in fact to abscond with the money thus furnished. In order to convince him that they were producing replicas of genuine notes, it was necessary to exhibit to him two bills bearing the same serial numbers, check letters, and face plate numbers. That was accomplished by the alterations set forth in the indictment. The alterations were not only material to the fraudulent scheme, but they were essential to it. They were the essence of it in the sense

that the fraud could not be effected without them. Plainly, the contention that they were immaterial cannot be sanctioned." Foster v. United States, 10 Cir. 1935, 76 F.2d 183, 184.

The above analysis has recently been quoted by our Court in affirming as to substance the conviction of three men who had increased the trading value of coins by altering the dates on such coins. Barnett v. United States, supra, 384 F.2d at 854–855.

To be sure, the Tenth Circuit's conviction in *Foster* was based on Section 148 (then 18 U.S.C. § 262 and currently codified as 18 U.S.C. § 471) which prohibits "altering" "with intent to defraud" and which has never included in its statutory framework an "intent to pass" requirement.[5] Likewise, the relevant statute in our *Barnett* case makes any fraudulent altering a crime.[6] Nevertheless, the *Foster* holding is equally applicable to the present wording of Section 472 which, like Section 471, contains no indication of an "intent to pass" requirement.

Moreover, even under the pre-1948 wording of what is now Section 472 many courts repudiated any "intent to pass" requirement. The discussion in United States v. Provenzano, S.D.N.Y. 1909, 171 F. 675, 676–677, demonstrates the earliest such rejection:

"It is contended that, where there is mere possession with knowledge of the counterfeit character of the obligation, it is necessary to charge in the indictment, and prove, not only an intent to defraud, but an intent to pass, publish, utter, or sell the same. In short, that one who passes, etc., * * * must do so with intent to defraud, but that mere possession of

such a counterfeit, and keeping in possession with knowledge of its character, and with intent to use it to defraud, is not a crime.

I do not construe this section of the Revised Statutes [the 1901 predecessor to Section 472, closely resembling the 1909 revision quoted supra]. The words 'with like intent' refer to the intent to defraud, not to all of the intents previously named, or to the intent attached to bringing counterfeits, etc., into the United States. Possession with intent to defraud, or with intent to pass, or utter, or sell, or publish, is sufficient. Mere possession with knowledge of the counterfeit character is not sufficient. There must be, with keeping in possession, an intent to defraud. An intent to pass or utter counterfeit silver certificates as good and genuine for a consideration would be an intent to defraud. It is plain that Congress intended to make the intent to defraud the criminal intent; for the section starts off by saying, 'Every person who with intent to defraud' does certain things, or who attempts to do certain things, or who brings certain counterfeits into the United States with intent to pass, etc., or who keeps in possession or conceals any counterfeit, etc., 'with like intent,' meaning plainly the main intent first mentioned, is to be punished.

As the objection is as to the indictment, which charged an intent to defraud and did not charge an intent to pass, utter, publish, or sell, and the evidence showed possession of counterfeit silver certificates with knowledge of their character and an intent to pass, or utter, or sell same—that is,

---

5. Section 148 read as follows:
  "Whoever, with intent to defraud, shall falsely make, forge, counterfeit, or alter any obligation or other security of the United States shall be fined not more than $5,000 and imprisoned not more than fifteen years."
  The present Section 471 is substantially the same, and the 1864 statute, quoted

supra, contained no "intent to pass" reference as to the crime of altering.

6. 18 U.S.C. § 331: "Whoever fraudulently alters, defaces, mutilates, impairs, diminishes, falsifies, scales, or lightens any of the coins coined at the mints of the United States * * *."

dispose of same as genuine—and thus defraud the taker or takers, and the jury was told they must find such intents in order to convict, and did so find, I hold the conviction good. I am not willing to hold, in face of the statute referred to and quoted, that it is not a crime to have and keep in possession, knowing their spurious character, counterfeit silver or gold certificates, with intent to defraud some person or persons therewith. I think the statute, reasonably construed to effectuate the plain intent thereof, makes such a possession with such knowledge and such an intent a crime.

The motion in arrest of judgment is overruled."

In 1935 our Court upheld a conviction for fraudulent possession of altered currency and stated:

"It was unnecessary for the indictment to state in what manner the fraud would be or was intended to be perpetrated. If it had contained such an allegation, it would have been improperly pleading the evidence." Smith v. United States, 5 Cir. 1935, 74 F.2d 941.

The *Smith* opinion was cited fourteen years later in McKinney v. United States, 9 Cir. 1949, 172 F.2d 781, when the Ninth Circuit specifically negated the need for an intent to pass under the immediate predecessor to Section 472:

"In the instant case this instruction was given:

'The jury must find beyond a reasonable doubt that the defendant kept such described altered security in his possession with knowledge of its character and with intent to defraud.'

\* \* \* \* \* \*

A reading of 18 U.S.C.A. § 265 discloses several alternative methods of violating such statute. One is with intent to defraud to keep in possession any such altered obligation. While each count of the information charged the appellant with such possession with intent to defraud each also in addition charged intent to pass. A conviction based upon an indictment charging pos-

session with 'intent to defraud' and without any charge of 'intent to pass' was sustained in Smith v. United States, 5 Cir., 74 F.2d 941. The additional language in the information before us of 'and with intent to pass' is clearly surplusage. The court's instructions eliminated such surplusage so that the jury's verdict definitely determined that the appellant had possession of the split notes with intent to defraud." 172 F.2d 782–783.

The appellants counter the above cases by excerpting the following sentence from our opinion in Riggs v. United States, 5 Cir. 1960, 280 F.2d 750, 752:

"When 'intent to defraud' under Section 472 is charged generally, we agree with the view of Judge Learned Hand, expressed in the case last cited [United States v. Rabinowitz, 2 Cir. 1949, 176 F.2d 732, 734], that there is no tenable distinction between such intent and the intent required by the next section, viz: ' \* \* \* with the intent that the same be passed, published, or used as true and genuine \* \* \*.' 18 U.S.C.A. § 473."

We find no solace for the appellants in *Riggs* when the above words are read in context. In that case we affirmed the substantive aspect of a conviction even though the defendant himself had never defrauded anyone. He had sold counterfeit bills to another who, knowing such bills to be counterfeit, accepted them with the intention of passing them to others as genuine bills.

The sentence which immediately precedes the one excerpted by the appellants reveals the thrust of the *Riggs* opinion:

"As to the substantive counts, the 'intent to defraud' required by 18 U.S.C.A. § 472, when, as here, such intent is not restricted by the terms of the indictment or by a bill of particulars to any specified person, may be an 'intent to defraud' unknown third persons or the United States itself. [authority cited]" 280 F.2d at 752.

The *Riggs* holding, then, extends the nature of the term "fraud" to include one potentially perpetrated by a cohort on an unknown third party. But it does not restrict the scope of illegal intentions to require this specific form of fraud. It is a conjunctive rather than an exclusive description. In fact, the *Riggs* opinion quotes Brooks v. United States, supra, in which "intent to pass" was considered irrelevant in a Section 472 (then 18 U.S.C. § 265) conviction. We find the same meaning in Rood v. United States, 8 Cir. 1965, 340 F.2d 506, cert. den., 381 U.S. 906, 85 S.Ct. 1452, 14 L.Ed.2d 287, which quotes *Riggs* at page 509 of the opinion.

■ The appellants have advanced an additional argument based on the specifics of the charges filed against them. They contend that the indictment was deficient because it did not allege the name of the potential "sucker." They add that the prosecution would not even supply that name in a Bill of Particulars. Although we question the nicety of the government's lack of cooperation, we find no reversible error. The indictment sufficiently informed the appellants of the nature of their charges even though no victim's name was mentioned. Mount v. United States, 5 Cir. 1964, 333 F.2d 39, 42–43, cert. den., 379 U.S. 900, 85 S.Ct. 188, 13 L.Ed.2d 175; Rua v. United States, 5 Cir. 1963, 321 F.2d 140, 141. Cf. Borroto v. United States, 5 Cir. 1964, 338 F.2d 60; Snowden v. United States, 5 Cir. 1967, 384 F.2d 357; Escobar v. United States, 5 Cir. 1967, 388 F.2d 661. Concerning the requested Bill of Particulars, in Leary v. United States, 5 Cir. 1967, 383 F.2d 851, this Court restated the following doctrine:

> "Granting or denial of a bill of particulars is a matter within the sound discretion of the trial judge, and will not be interfered with on appeal unless there is abuse or prejudice. [cases cited]."

We can see no abuse or prejudice to these appellants in the denial of the Bill of Particulars.

■ Finally, the appellants contend that a "sucker" cannot be defrauded because to be a "sucker" he must be dishonest; i. e., it is impossible to defraud a dishonest man. This argument is completely without merit. The victims of most confidence rackets have avarice in their hearts. Mutual dishonesty might bar a civil action, but the criminal law does not operate on a set-off or counterclaim policy. Moreover, as we have described, supra, the counterfeiting statutes seek to protect the integrity of the currency. Therefore, the malevolence of a victim cannot purge a currency alteration of its venality.

Affirmed.