## LAKE COUNTY COMMISSIONERS *v.* DUDLEY.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH CIRCUIT.

No. 177. Argued December 14, 15, 1898. — Decided February 20, 1899.

The instruments sued on in this case being payable to bearer, and having been made by a corporation, are expressly excepted by the Judiciary Act of August 13, 1888, c. 866, from the general rule prescribed in it that an assignee or subsequent holder of a promissory note or chose in action could not sue in a Circuit or District Court of the United States, unless his assignor or transferrer could have sued in such court.

From the evidence of Dudley himself, the plaintiff below, it is clear that he does not own any of the coupons sued on, and that his name is being used with his own consent, to give jurisdiction to the Circuit Court to render judgment for persons who could not have invoked the jurisdiction of a Federal court, and the trial court, on its own motion, should have dismissed the case, without considering the merits.

THE case is stated in the opinion.

*Mr. George R. Elder* for the Lake County Commissioners. *Mr. C. S. Thomas, Mr. W. H. Bryant* and *Mr. H. H. Lee* were on his brief.

*Mr. John F. Dillon* and *Mr. Edmund F. Richardson* for Dudley. *Mr. Harry Hubbard* and *Mr. John M. Dillon*

were on their brief. *Mr. Daniel E. Parks* filed a brief for Dudley.

MR. JUSTICE HARLAN delivered the opinion of the court.

This action was brought in the Circuit Court of the United States for the District of Colorado by the defendant in error Dudley, a citizen of New Hampshire, against the plaintiff in error the Board of County Commissioners of the County of Lake, Colorado, a governmental corporation organized under the laws of that State. Its object was to recover the amount of certain coupons of bonds issued by that corporation under date of July 31, 1880, and of which coupons the plaintiff claimed to be the owner and holder.

Each bond recites that it is "one of a series of fifty thousand dollars, which the Board of County Commissioners of said county have issued for the purpose of erecting necessary public buildings, by virtue of and in compliance with a vote of a majority of the qualified voters of said county, at an election duly held on the 7th day of October, A.D. 1879, and under and by virtue of and in compliance with an act of the general assembly of the State of Colorado, entitled 'An act concerning counties, county officers and county government, and repealing laws on these subjects,' approved March 24, A.D. 1877, and it is hereby certified that all the provisions of said act have been fully complied with by the proper officers in the issuing of this bond."

The Board of County Commissioners by their answer put the plaintiff on proof of his cause of action and made separate defences upon the following grounds: 1. That the bonds to which the coupons were attached were issued in violation of section six, article eleven of the constitution of Colorado and the laws enacted in pursuance thereof. 2. That the aggregate amount of debts which the county of Lake was permitted by law to incur at the date of said bonds, as well as when they were in fact issued, had been reached and exceeded. 3. That the plaintiff's cause of action, if any he ever had, upon certain named coupons in suit, was barred by

the statute of limitations.    4. That when the question of incurring liability for the erection of necessary public buildings was submitted to popular vote, the county had already contracted debts or obligations in excess of the amount allowed by law.

One of the questions arising on the record is whether Dudley had any such interest in the coupons in suit as entitled him to maintain this suit.    The evidence on this point will be found in the margin.[1]

---

[1] At the trial George W. Wright was introduced as a witness on behalf of the plaintiff.    He stated at the outset that Dudley was the owner of the bonds, but his examination showed that he had really no knowledge on the subject, and that his statement was based only upon inference and hearsay.    In connection with his testimony certain transfers or bills of sale to Dudley of bonds of the above issue of $50,000 were introduced in evidence as follows: One dated December 5, 1888, purporting to be "for value received" by Susan F. Jones, executrix of the estate of Walter H. Jones, deceased, of bonds Nos. 55 to 64, both inclusive, and Nos. 65 and 66; one dated February 11, 1885, by David Creary, Jr., J. H. Jagger, Henry D. Hawley and L. C. Hubbard, all of Connecticut, for bonds Nos. 80, 81 and 82, and Nos. 83 to 86, both inclusive, the consideration recited being $5380.56, "paid by Harry H. Dudley of Concord" in the county of Merrimac and State of New Hampshire; one dated March 20, 1885, by the Nashua Savings Bank of Nashua, New Hampshire, for twenty bonds, Nos. 92 to 111, both inclusive, the consideration recited being $11,869.45, "paid by Harry H. Dudley of Concord," New Hampshire; one dated March 20, 1885, by the Union Five Cents Saving Bank of Exeter, New Hampshire, of bonds Nos. 112 to 129, both inclusive, the consideration recited being $10,695, "paid by Harry H. Dudley of Concord," New Hampshire; one, undated, by Susan F. Jones, "for value received," of bonds Nos. 55 to 64, both inclusive, and Nos. 65 and 66, together with coupons falling due in 1884 of bonds Nos. 55 to 60, both inclusive; and one dated December 10, 1884, by Joseph Stanley of Colorado of twelve bonds, Nos. 68 to 79, both inclusive, and six bonds, numbered 67 and 87 to 91, both inclusive, the consideration recited being $15,887.50, "paid by Harry H. Dudley of Concord," New Hampshire.

Here were transactions which if genuine indicated the actual payment by Dudley in 1882 and 1884 on his purchase of bonds of many thousand dollars.

Dudley's deposition was taken twice; first on written interrogatories, January 14, 1895, and afterwards, March 2, 1895, on oral examination.

In his first deposition Dudley was asked whether he owned any bonds issued by Lake County, and he answered: "Yes, I own certain Lake County bonds which I hold under written bills of sale transferred to me from several different parties."    Being asked whether he owned any bonds of Lake

At the close of the plaintiff's evidence in chief the defend-
ant asked for a peremptory instruction in its behalf, but this
request was denied at that time.   When the entire evidence

---

County, Colorado, numbered 92 to 111 inclusive, 83 to 86 inclusive, 55 to
64 inclusive, 68 to 79 inclusive, 80 to 82 inclusive, 65, 66 and 67, and 87 to
91 inclusive, he answered : " I own, under the aforesaid bills of sale, bonds
mentioned in Interrogatory 3."   He was then asked (Interrogatory 4) if in
answer to the preceding interrogatory he said that he owned any of said
bonds or the coupons cut therefrom, to state when he purchased the same,
from whom he purchased them, and what consideration he paid' therefor.
In his answer he referred to each of the above mentioned bills of sale, and
said that he owned the bonds described in it *by virtue of* such instruments.
He did not say that he paid the recited consideration, but contented himself
with stating what was the consideration named in the bill of sale.   Being
asked (Interrogatory 5), " If you are not the owner of said bonds, or any
coupons cut therefrom, please state what, if any, interest you have in the
same," he answered :  " I have stated my interest in the bonds in my answer
*to Interrogatory 4."   He was asked (Interrogatory 9), " If you say you au-
thorized suit to be commenced in your name, please state under what cir-
cumstances you authorized it to be brought, and whether or not the bonds
or coupons upon which it was to be brought were your own individual prop-
erty, or were to be transferred to you simply for the purpose of bringing
said suit."   His answer was : " I understand said bonds and coupons were
transferred to me, as aforesaid, for the purpose of bringing suit against the
county to make them pay the honest debts of the county."

It should be stated that before the witness appeared before the commis-
sioner who took his deposition upon interrogatories, he prepared his an-
swers to the interrogatories with the aid of counsel, and read his answers
so prepared when he came before the commissioner.

When Dudley gave his second deposition his attention was called to his
answer to Interrogatory 4, in his first deposition, in relation to the bill of
sale running to him from Craig [Creary], Jagger, Hawley and Hubbard.
We make the following extract from his last deposition, giving questions
and answers as the only way in which to show what the witness intended
to say and what he intended to avoid saying: " Q. You also say in the
answer to which I have referred, that the consideration in the said bill of.
sale was $5380.56.. Did you pay that consideration for the bonds men-
tioned in the bill of sale?   A. No, I did not.   Q. Did you pay any part of
it?. A. No, sir.   Q. Why was that bill of sale made to you, Mr. Dudley?
A. I think I have answered that in some interrogatory here, my answer to
Interrogatory 9 in the deposition I gave before in this case.   Q. Are not
the bonds mentioned in the said bill of sale, together with the coupons,
still owned in fact by the grantors named in said bill of sale?   A. Not as
I understand the bill of sale.   I understand I am absolute owner.   Q. Was
not that bill of sale made to you for the purpose of enabling you to prose-

on both sides was concluded, the defendant renewed its request for a peremptory instruction, and the plaintiff asked a like instruction in his favor. The plaintiff's request was denied,

---

cute this claim upon them? A. My answer to Interrogatory 9 in my former deposition answers that also. Q. I repeat the question and ask for a categorical answer. A. I cannot more fully answer the question than I have in answer to Interrogatory 9, former deposition. Q. Do you decline to answer it, yes or no? A. I think this answer is sufficient. Q. If you are successful in the suit brought upon the coupons heretofore attached to the bonds mentioned in said bill of sale, do you not intend to pay the amount of those coupons so recovered to the grantors in said bill of sale, less any legitimate expenses attendant upon the prosecution of this case? A. Yes, my understanding in the matter would be something might be paid them. Q. Is there something to be paid them different from the amount involved in the suit represented by the coupons cut from said bonds? A. I should think there was. Q. In what respect is the difference? A. They would not be paid the full amount. Q. What deduction would you make? A. I do not know just what deduction would be made. Q. When you took this bill of sale, did you execute some sort of a written statement back to the grantors of said bill of sale? A. No, sir. Q. Did you make a verbal agreement at the time with them or any of them? A. No, sir. Q. Were you present when the bill of sale was drawn? A. No, sir. Q. Where was it drawn? A. My impression is that it was drawn at Hartford, Conn., this particular one that you refer to. Q. Yes. Who represented you at the drawing of the bill of sale? A. I have no knowledge of being represented there. Q. When did you first know that such bill of sale had actual existence? A. When I received it. Q. When was that? A. I cannot tell the date. It was in the year 1894. Q. Then you knew nothing of it until some nine years after it was made? A. That was the first I knew of it, the year 1894."

In reference to the bonds referred to in the bill of sale from Stanley, the witness testified: "Q. When did you first know of the existence of the bill of sale? A. I think it was in the year 1894. Q. Some ten years after it was made? A. Do you want me to answer that? Q. Yes. A. I received it as I have stated heretofore, that was the first I knew of it. Q. Are you personally acquainted with Joseph Stanley? A. I am not; no, sir. Q. Did you ever meet him? A. Don't remember that I ever met him. Q. Did you at any time ever pay him $15,887.50 for the bonds mentioned in his bill of sale to you? A. No, sir. Q. Is it not a fact that Mr. Stanley still owns these bonds? A. I have answered in a former deposition that I hold a bill of sale of certain bonds of Joseph Stanley. Q. Do you refuse to answer the last question I asked you, yes or no? A. I prefer to answer it as I have stated above. Q. If you should recover in this suit, are not the amounts represented by the coupons cut from the bonds mentioned in the Stanley bill of sale to be paid to Joseph Stanley less the expenses of this suit? A. I could not answer that definitely. Q. Why not? A. Because

an exception to the ruling of the court being reserved. Other instructions asked by the plaintiff were refused, and in obedience to a peremptory instruction by the court the jury returned

I haven't enough knowledge of the matter to answer it definitely. Q. You have no knowledge of it at all personally, have you? A. My understanding of the matter would be, Joseph Stanley would have a certain amount of money if the suit was won. Q. Was not the bill of sale drawn in Denver — the Stanley bill of sale? A. I have no actual knowledge where it was drawn. Q. Do you know who had the bill of sale before it was sent on to you in 1894? A. I do not think I have any actual knowledge. Q. Did you have any sort of knowledge? A. Yes. I imagined it came from Rollins & Son. Q. By letter? A. It came through the mail. Q. Have you the letter now? A. I do not think that I have; no, sir. Q. What did you do with it? A. I could not swear that it was. Q. It came in December of 1894, did it not? A. I should say it did."

As to the bonds referred to in the bill of sale by Susan F. Jones, executrix, the witness testified: " Q. What did you pay for that bill of sale, Mr. Dudley? A. For consideration not named in the bill of sale. Q. That does not answer my question. What did you pay for it? A. I do not remember as I paid anything. Q. Do you remember that you did not pay anything? A. It is my impression that I did not. Q. Were you present when it was drawn? A. No, sir. Q. In the event you recover a judgment in this case, are not the amounts of the coupons belonging to the bonds mentioned in the bill of sale from Mrs. Jones to be paid to Mrs. Jones, less her proportion of [the expenses of] the case? A. I could not state definitely about that. Q. Why? A. For the reason that I answered similar questions above. Q. Going back to the bonds of Mr. Stanley, I will ask you one or two other questions. Is Mr. Stanley a citizen of Colorado? A. I think he is. Q. Now why did you not include in this case the coupons belonging to the Stanley bonds for 84, 85 and 86, and the coupons to bonds 68 to 72, including in the Stanley bill of sale of 1888, and the coupons on 67, 87–91 for 1884–'5? A. If they were not included I do not know why they were not. Q. Is Mrs. Jones a citizen of the State of Colorado? A. I think she is. Q. Were not those bonds of Stanley and Jones assigned to you in order that you might as a citizen of another State bring suit upon them and upon the coupons belonging to them in the Federal court in Colorado? A. I should answer that by referring to my answer in former deposition to Interrogatory 9."

In reference to the other bills of sale and the bonds mentioned in them, the witness testified: " Q. In your answer to Interrogatory 4 of your former deposition you also say that you own bonds of Lake County by the written bill of sale from the Nashua Savings Bank, numbered 92–111, both inclusive, together with all coupons originally attached and unpaid. You also say that the consideration for the said bill of sale is $11,689.45. Did you pay any part of that, Mr. Dudley? A. No, sir. Q. Were you present

a verdict for the defendant, and judgment was accordingly entered upon that verdict. Upon writ of error to the Circuit Court of Appeals the judgment was reversed, Judge Thayer dissenting. 49 U. S. App. 336.

1. In the oral argument of this case some inquiry was made

---

when the bill of sale was drawn ? A. No, sir. Q. When did you first know that there was such a bill of sale ? A. As soon as I received it, in the year 1894. Q. In the event of a recovery in this case, are not the amounts of the coupons belonging to the said bonds to be paid over to the Nashua Savings Bank, less their proportion of the expense of this litigation ? A. I do not know how much will be paid them. Q. Do you know anything about it ? A. Indirectly, yes. Q. Do you mean by that you have some hearsay evidence upon it ? A. Yes; I have an impression from hearsay that the bank would have some equivalent for these bonds if suit was won. Q. You say here that you own bonds of Lake County by virtue of a bill of sale from the Union Five Cent Savings Bank of Exeter, numbered 112–129, inclusive, together with all coupons, the first being No. 4, and the subsequent ones being consecutive up to and including No. 21. What is the date of that bill of sale ? A. I think it was dated March 25, 1885. Q. Were you present when it was made ? A. No, sir. Q. When did you first know of its existence ? A. In the year 1894. Q. At the time that you were informed of the existence of the others ? A. Nearly at the same time, I should say. Q. Did you pay the Bank of Exeter $10,695, or any other sum for the bonds mentioned in that bill of sale ? A. No, sir. Q. You also say in the same answer to the same interrogatory in your former deposition that you hold a bill of sale and assignment from Susan F. Jones for coupons Nos. 55 to 64 and Nos. 65 to 66 for the years 1886, '7, '8, 1891, also coupons amounting to $600 from bonds 55–6–7–8–9–60 falling due in the year 1894. What is the date of that bill of sale and assignment ? A. I could not tell. Q. When did you first know of its existence ? A. I should say in 1894. Q. Did you pay anything for it ? A. No, sir. . . . Q. Did you ever have in your possession any of the coupons or any of the bonds to which this examination has thus far been directed ? A. Strictly speaking, I don't think I ever had them in my own possession. I have seen some of the bonds and handled them, had them in a safe. Q. Where ? A. In Boston. Q. When ? A. Well, I should say in the year 1893. Q. But that was before you knew they had been assigned to you by bill of sale, was it not ? A. I was really handling them as agent for other parties. Q. Who were the other parties you were handling them as agent for ? A. I don't know as I was exactly an agent. I was an officer of another company. They came into our hands. Q. What was that company ? A. E. H. Rollins & Sons. Q. Were you a stockholder of that company ? A. Yes. Q. Are you now ? A. Yes, sir. Q. Is not that the only interest which you have in these bonds or any of them — your interest as a stockholder in the firm of E. H. Rollins & Sons ? A. Yes, probably it is."

whether Dudley's right to maintain this action was affected by that clause in the first section of the Judiciary Act of August 13, 1888, c. 866, 25 Stat. 433, 434, providing that no Circuit or District Court of the United States shall "have cognizance of any suit, except upon foreign bills of exchange, to recover the contents of any promissory note or other chose in action in favor of any assignee, or of any subsequent holder if such instrument be payable to bearer and be not made by any corporation, unless such suit might have been prosecuted in such court to recover the said contents if no assignment or transfer had been made." The provision on the same subject in the act of March 3, 1875, but which was, of course, displaced by the clause on the same subject in the act of 1888, was as follows: "Nor shall any Circuit or District Court have cognizance of any suit founded on contract in favor of an assignee, unless a suit might have been prosecuted in such court to recover thereon if no assignment had been made, except in cases of promissory notes negotiable by the law merchant and bills of exchange." 18 Stat. 470, c. 137, § 1.

Without stopping to consider the full scope and effect of the above provision in the act of 1888, it is only necessary to say that the instruments sued on being payable to bearer and having been made by a corporation are expressly excepted by the statute from the general rule prescribed that an assignee or subsequent holder of a promissory note or chose in action could not sue in a Circuit or District Court of the United States unless his assignor or transferrer could have sued in such court. It is immaterial to inquire what were the reasons that induced Congress to make such an exception. Suffice it to say that the statute is clear and explicit, and its mandate must be respected.

2. There is however a ground upon which the right of Dudley to maintain this action must be denied.

By the fifth section of the above act of March 3, 1875, it is provided "that if, in any suit, commenced in a Circuit Court or removed from a state court to a Circuit Court of the United States, it shall appear to the satisfaction of said Circuit Court, at any time after such suit has been brought or removed

thereto, that such suit does not really and substantially involve a dispute or controversy properly within the jurisdiction of said Circuit Court, or that the parties to said suit have been improperly or collusively made or joined, either as plaintiffs or defendants, for the purpose of creating a case cognizable or removable under this act, the said Circuit Court shall proceed no further therein, but shall dismiss the suit or remand it to the court from which it was removed as justice may require, and shall make such order as to costs as shall be just." 18 Stat. 470, 472, c. 137. This provision was not superseded by the act of 1887, amended and corrected in 1888. 25 Stat. 433. *Lehigh Mining & Manfg. Co.* v. *Kelly*, 160 U. S. 327, 339.

Prior to the passage of the act of 1875 it had been often adjudged that if title to real or personal property was put in the name of a person for the purpose only of enabling him, upon the basis of the diverse citizenship of himself and the defendant, to invoke the jurisdiction of a Circuit Court of the United States for the benefit of the real owner of the property who could not have sued in that court, the transaction would be regarded in its true light, namely, as one designed to give the Circuit Court cognizance of a case in violation of the acts of Congress defining its jurisdiction; and the case would be dismissed for want of jurisdiction. *Maxwell's Lessee* v. *Levy*, 2 Dall. 381; *Hurst's Lessee* v. *McNeil*, 1 Wash. C. C. 70, 80; *M'Donald* v. *Smalley*, 1 Pet. 620, 624; *Smith* v. *Kernochen*, 7 How. 198, 216; *Jones* v. *League*, 18 How. 76, 81; *Barney* v. *Baltimore City*, 6 Wall. 280, 288. These cases were all examined in *Lehigh Mining & Manfg. Co.* v. *Kelly*, 160 U. S. 327, 339. In the latter case it appeared that a Virginia corporation claimed title to lands in that Commonwealth which were in the possession of certain individuals, citizens of Virginia. The stockholders of the Virginia corporation organized themselves into a corporation under the laws of Pennsylvania in order that the Pennsylvania corporation, after receiving a conveyance from the Virginia corporation, could bring suit in the Circuit Court of the United States sitting in Virginia, against the citizens in that Commonwealth

who held possession of the lands. The contemplated convey-
ance was made, but no consideration actually passed or was
intended to be passed for the transfer. This court held that
within the meaning of the act of 1875 the case was a collusive
one and should have been dismissed as a fraud on the juris-
diction of the United States court. It said: "The arrange-
ment by which, without any valuable consideration, the stock-
holders of the Virginia corporation organized a Pennsylvania
corporation and conveyed these lands to the new corporation
for the express purpose — and no other purpose is stated or
suggested — of creating a case for the Federal court, must be
regarded as a mere device to give jurisdiction to a Circuit
Court of the United States, and as being in law a fraud upon
that court, as well as a wrong to the defendants. Such a
device cannot receive our sanction. The court below properly
declined to take cognizance of the case." And this conclusion,
the court observed, was "a necessary result of the cases aris-
ing before the passage of the act of March 3, 1875."

From the evidence in this cause of Dudley himself it is cer-
tain that he does not in fact own any of the coupons sued
on and that his name, with his consent, is used in order that
the Circuit Court of the United States may acquire jurisdic-
tion to render judgment for the amount of all the coupons in
suit, a large part of which are really owned by citizens of Colo-
rado, who, as between themselves and the Board of Commis-
sioners of Lake County, could not invoke the jurisdiction of
the Federal court, but must have sued, if they sued at all, in
one of the courts of Colorado. It is true that some of the
coupons in suit are owned by corporations of New Hampshire
who could themselves have sued in the Circuit Court of the
United States. But if part of the coupons in question could
not by reason of the citizenship of the owners have been sued
on in that court, except by uniting the causes of action arising
thereon with causes of action upon coupons owned by persons
or corporations who might have sued in the Circuit Court of
the United States, and if all the causes of actions were thus
united for the collusive purpose of making "a case" cognizable
by the Federal court as to every issue made in it, then the act

of 1875 must be held to apply, and the trial court on its own motion should have dismissed the case without considering the merits.

In *Williams* v. *Nottawa*, 104 U. S. 209, 211, this court said that Congress when it passed the act of 1875 extending the jurisdiction of the courts of the United States "was specially careful to guard against the consequences of collusive transfers to make parties, and imposed the duty on the court, on its own motion, without waiting for the parties, to stop all further proceedings and dismiss the suit the moment anything of the kind appeared. This was for the protection of the court as well as parties against frauds upon its jurisdiction."

So, in *Farmington* v. *Pillsbury*, 114 U. S. 138, 146, which was a suit upon coupons, brought by a citizen of Massachusetts against a municipal corporation of Maine, and in which one of the questions was as to the real ownership of the coupons, this court said: "It is a suit for the benefit of the owners of the bonds. They are to receive from the plaintiff one half of the net proceeds of the case they have created by their transfer of the coupons gathered together for that purpose. The suit is their own in reality, though they have agreed that the plaintiff may retain one half of what he collects for the use of his name and his trouble in collecting. It is true the transaction is called a purchase in the papers that were executed, and that the plaintiff gave his note for $500, but the time for payment was put off for two years, when it was, no doubt, supposed the result of the suit would be known. No money was paid, and as the note was not negotiable, it is clear the parties intended to keep the control of the whole matter in their own hands, so that if the plaintiff failed to recover the money he could be released from his promise to pay." It was consequently held that the transfer of the coupons was "a mere contrivance, a pretence, the result of a collusive arrangement to create a fictitious ground of Federal jurisdiction."

In *Little* v. *Giles*, 118 U. S. 596, 603, reference was made to the act of 1875, and the court said that where the interest of the nominal party was "simulated and collusive, and created for the very purpose of giving jurisdiction, the courts

should not hesitate to apply the wholesome provisions of the law."

We have held that if, for the purpose of placing himself in a position to sue in a Circuit Court of the United States, a citizen of one State acquires a domicil in another State without a present intention to remain in the latter State permanently or for an indefinite time, but with the present intention to return to the former State as soon as he can do so without defeating the jurisdiction of the Federal court to determine his suit, the duty of the Circuit Court is on its own motion to dismiss such suit as a collusive one under the act of 1875. *Morris* v. *Gilmer*, 129 U. S. 315. The same principle applies where there has been a simulated transfer of a cause of action in order to make a case cognizable under the act.

The cases cited are decisive of the present one. As the coupons in suit were payable to bearer and were made by a corporation, Dudley being a citizen of New Hampshire could have sued the defendant a Colorado corporation in the Circuit Court of the United States without reference to the citizenship of his transferrers or the motive that may have induced the transfer of the coupons to him, or the motive that may have induced him to buy them, provided he had really purchased them. But he did not buy the coupons at all. He is not the owner of any of them. He is put forward as owner for the purpose of making a case cognizable by the Federal court as to all the causes of action embraced in it. The apparent title was put in him without his knowledge and without his request, and only that he might represent the interests of the real owners. He never requested the execution of the pretended bills of sale referred to, nor did he hear of their being made until more than nine years after they were signed. And, notwithstanding the evasive character of his answers to questions, it is clear that his transferrers are the only real parties in interest and his name is used for their benefit. The transfer was collusive and simulated for the purpose of committing a fraud upon the jurisdiction of the Circuit Court in respect at least of part of the causes of action that make the case before the court.

For the reasons stated the trial court, when the evidence

was concluded, should on its own motion have dismissed the suit. The judgment of the Circuit Court and the judgment of the Circuit Court of Appeals must both be

> *Reversed and the cause remanded for a new trial and for further proceedings consistent with this opinion, and it is so ordered.*