William J. SYMS, Jr., Plaintiff-Appellee-Cross Appellant,

v.

CASTLETON INDUSTRIES, INC., Defendant-Appellant-Cross Appellee.

No. 71–2326.

United States Court of Appeals, Fifth Circuit.

Nov. 20, 1972.

Rehearing and Rehearing En Banc Denied Jan. 2, 1973.

Irving B. Levenson, Miami Beach, Fla., for appellant.

Raymond A. Noble, Newark, N. J., Richard S. Banick, Miami, Fla., Jerome C. Eisenberg, Newark, N. J., for appellee.

Before PHILLIPS,* THORNBERRY and RONEY, Circuit Judges.

PHILLIPS, Circuit Judge: [1]

On December 15, 1965, the issued and outstanding stock of the Broward County Kennel Club, Inc.[2] a Florida corporation, was 24,556⅔ shares of such stock, William J. Syms, Jr., owned 7,500 shares, Elizabeth V. Syms owned 5,637½ shares and Syms, Jr., and Thomas M. Lynch, III, as trustees of a testamentary trust under the will of William J. Syms, Sr., deceased, owned 5,637½ shares.

Elizabeth was the surviving widow and Syms, Jr., the surviving son of Syms, Sr.

On December 15, 1965, Syms, Jr., and Elizabeth, and Syms, Jr., and Lynch, as trustees under such trust, entered into a contract with Investment Corporation of South Florida,[3] a Florida corporation, for the sale by them to the Investment Corporation of the 18,775 shares of stock of Broward owned by them.

On April 22, 1966, Broward was merged into Investment Corporation, and on

* Hon. Orie L. Phillips, of the Tenth Circuit, sitting by designation.

1. Judge Thornberry has filed a special concurrence and Judge Roney a dissent.

2. Hereinafter referred to as Broward.

3. Hereinafter referred to as Investment Corporation.

February 13, 1969, Investment Corporation was merged into Castleton Industries, Inc.,[4] a Delaware corporation, which has its principal place of business in Florida.

On December 8, 1969, Syms, Jr., brought this action against Castleton to recover damages in the amount of $309,161.14 for the alleged failure of Broward and its successors to pay federal income taxes which accrued prior to December 1, 1965, and the alleged failure of Broward and its successors to abide by their obligations under such contract of sale.

Jurisdiction was based on 28 U.S.C.A. § 1332 (diversity jurisdiction).

Castleton properly challenged the court's jurisdiction. The court held it had jurisdiction and rendered judgment in favor of Syms, Jr. Castleton has appealed.

Since we hold that the court did not have jurisdiction, we will state only the facts bearing on that issue.

It is undisputed that at the time the action was commenced, Syms, Jr., was a citizen of Colorado and Lynch was a citizen of Florida, and that Castleton had its principal place of business in Florida.

In his deposition taken on January 21, 1970, Syms, Jr., testified that Elizabeth's home was in Federal Towers, Hollywood, Florida. However, in an affidavit made on November 2, 1970, and filed in the instant case on November 6, 1970, he averred:

"* * * to affiant's knowledge and belief, his mother was not a citizen of Florida at the time of institution of the instant action but, to the contrary, has been a citizen of the State of New Jersey since 1968."

In her affidavit, made on November 6, 1970, and filed in the instant case on December 3, 1970, Elizabeth averred that some time in 1968 she became a citizen of New Jersey and registered to vote there, and that she considered New Jersey the place of her citizenship and domicile.

We think it was established that Elizabeth was not a citizen of Florida when the instant action was commenced. However, it is obvious from what Syms, Jr., testified to in his deposition, taken on January 21, 1970, that at the time the assignment hereinafter referred to was executed, on May 13, 1969, and at the time the instant action was commenced, on December 8, 1969, Syms, Jr., and his counsel, Jerome C. Eisenberg, believed his mother, Elizabeth, was a citizen of Florida.

On May 13, 1969, Elizabeth, individually, and Syms, Jr., and Lynch, as such trustees, executed a purported assignment, reading in part here material as follows:

### "ASSIGNMENT

"FOR VALUE RECEIVED we, the undersigned do hereby sell, transfer, assign and set over unto WILLIAM J. SYMS, JR., all of our right, title and interest to any claim, suit, demand, damage and recovery against BROWARD COUNTY KENNEL CLUB, INC. and INVESTMENT CORPORATION OF SOUTH FLORIDA, or either of them, arising out of or related to that certain Agreement dated December 15, 1965, wherein the undersigned and said WILLIAM J. SYMS, JR., are designated as 'Sellers', as well as that certain Escrow Agreement entered into pursuant to Section 11 of the afore-described agreement, the said Escrow Agreement having been entered into on April 22, 1969, including, but not limited to, the payment by assignors herein designated and assignee herein designated to Internal Revenue Service on or about December 5, 1967, of the sum of Three Hundred Nine Thousand One Hundred Sixty One and 14/100 ($309,161.14) Dollars for the account of Broward County Kennel Club Inc."

At the trial, Syms, Jr., testified that the assignment was prepared by Eisen-

---

4. Hereinafter referred to as Castleton.

berg, his attorney, and that Eisenberg advised him to execute such assignment.

In a letter dated January 28, 1969, from Eisenberg to Marion E. Sibley, the attorney for Investment Corporation and Castleton, Eisenberg said in part:

"Pursuant to our conversation at the informal conference at your office on Friday, January 24, 1969, we herewith make formal demand upon your clients, Investment Corporation of South Florida (being the Buyer under an agreement bearing date December 15, 1965) or the Broward County Kennel Club, or both, on behalf of and for payment to our clients, William J. Syms, Jr., his mother, Elizabeth V. Syms, and William J. Syms, Jr., and Thomas M. Lynch III, Trustees under the will of William J. Syms, Sr. (being the Sellers under that agreement and hereafter referred to as such, for convenience) of the sum of $309,161.14, and interest thereon from December 5, 1967."

Thus, it will be seen that as late as January 28, 1969, Eisenberg was representing all of the sellers.

On February 25, 1969, Sibley responded, and for reasons set out in his letter which related only to the merits of the asserted claim, stated that the demand placed the claim beyond any possibility of adjustment or settlement. It was not until then that Syms, Jr., and Eisenberg realized that to enforce the claim of the sellers, resort to litigation would have to be made.

It is significant that shortly thereafter Eisenberg made his next move, which was to prepare the assignment dated May 13, 1969, and advise all of the sellers to sign it.

It will be remembered that at that time Syms, Jr., believed Elizabeth was a citizen of Florida, and it is fair to assume that Eisenberg also believed that.

Thereafter, the present action was instituted, naming only Syms, Jr., as plaintiff. It alleged that

"On or about April 22, 1969, plaintiff received an assignment from Elizabeth V. Syms; and from Thomas M. Lynch, III, and William J. Syms, Jr., as trustees, of all their rights, title, and interest to any claim, suit, demand, damage, and recovery against Broward or its successor corporations arising out of or related to the agreement entered into between them and Investment Corporation of South Florida. * * * "

As we shall hereafter show, such allegation was not true.

Eisenberg appeared as attorney for Syms, Jr., in the action.

It will be noted that the assignment recited:

"FOR VALUE RECEIVED we, the undersigned, do hereby sell, transfer, assign and set over unto WILLIAM J. SYMS, JR., * * * "

Syms, Jr., further testified at the trial that the assignment was true and correct in all of its statements and recitals, yet he later admitted on cross-examination that he did not pay Elizabeth, nor Lynch and himself, as such trustees, anything for the assignment, and that he did not get anything by the assignment.

The contract for the sale of the stock provided that the sellers should indemnify Investment Corporation against all claims, liabilities, assessments, or deficiencies against Broward, which were not reflected on its balance sheet of August 31, 1965, excluding any liability for income tax on receipts for the period commencing December 17, 1965. It further provided that $500,000 of the purchase price of such stock should be placed in escrow with the Bank of Hollywood, Hollywood, Florida, to secure such agreement to indemnify.

On March 22, 1966, the Internal Revenue Service assessed a total deficiency against Broward for taxes for the years 1963, 1964, and 1965 of $577,716. The deficiency was settled for $218,161.14 and that amount and $91,000 attorney's fees were paid out of the escrow fund. Forty per cent of the escrow fund belonged to Syms, Jr.; 30 per cent belonged to Elizabeth; and 30 per cent belonged to

Syms, Jr., and Lynch, as such trustees. Hence, Syms, Jr., paid $87,264.45; Elizabeth paid $65,448.34; and Syms, Jr., and Lynch, as such trustees, paid $65,448.34 of the amount of the tax settlement. Syms, Jr., so admitted in his testimony.

He further admitted in his testimony that if there was a recovery by him in the action, 30 per cent thereof would go to Elizabeth; 30 per cent to such trustees; and 40 per cent to him.

Hence, it is perfectly clear that Syms, Jr., gave no consideration to the assignors for such assignment, and that notwithstanding the language of the assignment, it was the intention of Syms, Jr., Elizabeth, and Syms, Jr., and Lynch, as such trustees, that Elizabeth should not part with, but would retain 30 per cent of all the right, title and interest of the sellers "to any claim, suit, demand, damage and recovery"[5] against Broward Investment Corporation, or Castleton, or "either of them," arising out of the stock sale agreement of December 15, 1965; out of an escrow agreement entered into on April 22, 1969, pursuant to paragraph 11 of such stock sale agreement; out of the payment from the $500,000 deposited in escrow, of $218,161.14 in settlement of the tax deficiency and $91,000 for attorney's fees incurred in resisting such deficiency and securing settlement thereof; and out of the balance remaining in the escrow fund so deposited. In short, Syms, Jr., Elizabeth, and Syms, Jr., and Lynch, as such trustees, intended that such trustees should not part with, but would retain their 30 per cent of the right, title and interest of the sellers in any claim so arising against Broward, Investment Corporation, or Castleton, or any of them.

Hence, we conclude that notwithstanding the assignment, Elizabeth retained her 30 per cent interest, and Syms, Jr., and Lynch, as such trustees, retained their 30 per cent interest in all the right, title and interest of the sellers in any claim so arising against Broward, In-vestment Corporation, and Castleton, or any of them. To hold otherwise, would be to give effect to mere form and wholly disregard truth and reality.

Syms, Jr., testified at the trial that the assignment was executed by Elizabeth, because she was 74 years of age and had suffered from a bad heart and high blood pressure for more than 10 years; that he had managed and handled all of her business affairs and looked after her financial interests since his father's death in April 1957; that she had no knowledge of any of the facts that related to the claims asserted against Castleton in the instant action; that he did not want to upset her or have her health impaired by becoming involved in a "lawsuit"; and that her going to Miami would not have served any useful purpose.

Elizabeth averred in an affidavit made on November 6, 1970, and filed in the instant case on December 3, 1970, that the agreement to sell the stock of Broward owned by her, Syms, Jr., and such trustees was not prompted by her or Lynch, but by Syms, Jr.'s desire to sell such stock; that she did not participate in any way in the negotiations leading up to the stock sale agreement or in arriving at the terms thereof; that the only part she took in the matter was to sign her name to the final draft of the agreement; that she had no part in nor knowledge with respect to the negotiations carried on in the endeavor to settle the claims of the sellers against Investment Corporation or Castleton; and that she had no part in nor knowledge with respect to the settlement of the tax deficiency assessed against Broward, nor of the payment made to the Internal Revenue Service of the amount agreed on by such settlement out of the escrow fund. It is clear, therefore, that making Elizabeth a party plaintiff in the instant action would not have required her to go to Miami, to be present at the trial, or to take any part in the trial of the case.

5. We shall hereinafter refer to the phrase "to any claim, suit, demand, damage and recovery" by the word "claim."

Her lack of knowledge of any of the relevant facts respecting the claims of the sellers asserted by Syms, Jr., in the action he brought against Castleton shows she could not have been of any assistance to counsel for Syms, Jr., either before or at the trial, and that she could not have testified as a witness to any material fact relating to the issues of fact in the action. In short, making her a party plaintiff in such action would not have involved her in any way in the "lawsuit." All she needed to have done, had she been made a party, was to have authorized Syms, Jr., if her general authorization theretofore given to him to look after her business affairs and take care of her financial interests was not sufficient, to act for her and represent her in the action in all matters relating to her claim, as one of the sellers, against Castleton.

Since joining Elizabeth as a party plaintiff would not have involved her in the lawsuit, and since Eisenberg and Syms, Jr., believed Elizabeth was a citizen of Florida at the time the assignment was executed and at the time the instant action was commenced, we think it is obvious, under all the existing facts and circumstances, that their purpose in having Elizabeth execute the assignment was to endeavor to make it unnecessary to join her as a party plaintiff in the action, and if they could also eliminate the necessity of joining Lynch as a party to the action, they would be able to preserve diversity of citizenship between the parties to the action.

■ However, since Elizabeth was in fact a citizen of New Jersey at the time the action was commenced, the purported assignment of her 30 per cent interest in such claims to Syms, Jr., although Syms, Jr., gave nothing for such assignment and received nothing by it and it was merely a colorable assignment, was not improperly or collusively made to invoke the jurisdiction of the United States District Court for the Southern District of Florida, prohibited by 28 U.S.C.A. § 1359, the text of which is set out, infra.

The trusteeship of Syms, Jr., and Lynch of the testamentary trust created by Syms, Sr., began prior to December 15, 1965.

In an affidavit made by Syms, Jr., on November 2, 1970, and filed November 6, 1970, he averred that immediately after the sale of the stock in Broward to Investment Corporation on December 15, 1965, Lynch was employed by Investment Corporation as Vice-President and General Manager, and since that time had continued to hold the position of Vice-President and General Manager of Investment Corporation and its successor, Castleton, the defendant in the instant action; that at no time since he and Lynch became trustees under the trust, had Lynch taken an active part in the administration of the trust; that all decisions concerning the administration of the trust had been made by Syms, Jr., with the assistance of an attorney exclusively employed by him; that Lynch was not made a party plaintiff to the instant action, because he had never taken an active part in the administration of the affairs of the trust; "and that by virtue of his continued association and status with the defendant (Castleton) and its predecessor corporation (Investment Corporation) his interests conflict with the best interests of the trust involved, as well as the interests of affiant and his mother (Elizabeth)."

But here again, actions speak louder than words. The preferable way to have remedied such conflict of interests would have been for Syms, Jr., and Elizabeth to ask Lynch to resign as trustee of the trust, and if he refused, to take steps to have him removed as such trustee. Surely, the facts testified to or averred by Syms, Jr., above set out, would have been ample grounds for Syms, Jr., and Elizabeth, as beneficiaries under the trust, to petition the Circuit Court of Broward County, Florida, which had jurisdiction over the administration of the trust, to remove Lynch as such trustee, and would have been ample grounds for his removal by such court.

Another way would have been to have Lynch and Syms, Jr., as cotrustees of the trust, by a bona fide instrument and for a fair and adequate consideration, transfer to Syms, Jr., all the rights, title and interest that Lynch and Syms, Jr., as cotrustees of the trust, had in the claims on which the instant action was based and in any judgment that might be obtained in such claims in such action, with the bona fide intention of the transferors and transferee that such instrument would transfer to Syms, Jr., all of the rights, title and interest that they held as cotrustees in such claims and would have in any judgment obtained in such action. Such a transfer or the resignation or removal of Lynch would have been in all respects valid and would have made it unnecessary to join Lynch, as cotrustee, as a party plaintiff in the action, and would not have been improper or collusive, as we shall hereafter show, under 28 U.S.C.A. § 1359.

Unfortunately for Syms, Jr., and his mother, that course was not followed. Instead, Syms, Jr., and his counsel undertook to accomplish that result by a sham, colorable, and ineffective assignment, which did not divest Lynch of his title as cotrustee to the property of the trust nor prevent him, should he choose to do so, from performing his duties as cotrustee and exercising the powers vested in him as cotrustee of the trust, and therefore did not remedy the conflict of interests.

There can be little doubt that it was the intention of Syms, Jr., that there should be one trustee who had no financial interest in the trust and represented no interests conflicting with the interests of the trust. Lynch's conflict of interests existed at least from the time the controversy arose between the sellers and Investment Corporation, which was not later than December 7, 1967, long before the assignment was prepared and executed. Syms, Jr., who dominated the trust, and also managed and handled all of Elizabeth's business affairs and looked after her financial interests, should have asked Lynch for his resigna-

tion as trustee immediately after the controversy and conflict of interests arose, and if he refused to resign, without delay should have taken steps to remove him by court action, and upon Lynch's resignation or removal should have petitioned the court to appoint a qualified successor who had no financial interest in the trust and had no interests which conflicted with the interests of the trust.

In view of the foregoing, it is significant in endeavoring to determine the reasons for the execution of the assignment by Lynch to keep in mind that it was not until the negotiations for a settlement reached an impasse and Eisenberg and Syms, Jr., realized that resort to a legal action would be necessary to enforce the sellers' claims that Syms, Jr., as he averred in his affidavit, became concerned about such conflict of interests and sought to make it unnecessary for Lynch to be joined in the action as a party plaintiff by a sham assignment.

We shall presently show that the courts, in determining whether an assignment is improper within the meaning of that term in 28 U.S.C.A. § 1359, give much weight to the fact, on one hand, that the assignment was bona fide and actually transferred unconditionally to the assignee what it purported to transfer, and to the fact, on the other hand, that the assignment was merely colorable and the parties did not intend that what it purported to transfer to the assignee should be in fact transferred, but should remain in the assignor. An assignment having the latter effect is frequently referred to in the decided cases as a sham assignment.

The only finding of the court here material is finding No. 3, which reads:

"3. The cause of action was assigned by Elizabeth V. Syms, individually, and by Thomas M. Lynch III and William J. Syms, Jr., as trustees of a testamentary trust under the will of William J. Syms, Sr. to William J. Syms, Jr., the plaintiff, because (a) Elizabeth V. Syms (mother of the

plaintiff) age 74, has been in poor health for many years and since at least 1968, was under continual doctor's care for heart disease and high blood pressure; (b) following the purchase of stock under the Agreement, Lynch continued in the employment of Buyer as general manager and plaintiff believed that the interests of Lynch, as a co-trustee with plaintiff, would conflict with the best interests of the trust by virtue of his continued association and status with the Buyer, and (c) all knowledge and management of the business, its sale, and control of this cause of action and litigation was vested in the plaintiff."

It will be observed that the court did not find that the assignment transferred to Syms, Jr., Elizabeth's right, title and interest in 30 per cent and Syms, Jr.'s and Lynch's right, title and interest, as trustees of the trust, in 30 per cent of the claim described in the assignment. Of course, it could not have properly done so, in the face of the testimony of Syms, Jr.

It clearly appears from the testimony of Syms, Jr., and the averments in his affidavit that he and Eisenberg wanted to avoid the necessity of making Elizabeth, and Lynch, as cotrustee, parties plaintiff to the action in the instant case. As we have above shown, Syms, Jr., stated the reason for having Elizabeth execute the assignment was to make it unnecessary to join her as a party plaintiff in the action and thereby avoid her becoming involved in the lawsuit.

We have also shown, for reasons fully stated above, that making Elizabeth a party plaintiff in the action would not have involved her in the lawsuit, and that Syms, Jr., knew that when the assignment was prepared and executed and the action was commenced.

We have shown that the reasons stated by Syms, Jr., for having Lynch, as cotrustee, execute the assignment were to divest him of all interest, as such cotrustee, in the claims on which the action was based, and thereby make it unnecessary to join him as a party plaintiff and thus remedy the conflict of interests, the particulars of which are hereinbefore set out. We have also shown that instead of following one of two proper and lawful ways of curing such conflict, Syms, Jr., and Eisenberg undertook to divest Lynch, as cotrustee, of any interest in such claims by an assignment which purported to so divest him, but which in fact was only colorable and a sham and did not divest Lynch of any of his interest in such claims.

It follows that the reasons given for having Elizabeth execute the assignment were baseless, and that the colorable assignment did not divest either Elizabeth or Lynch, as cotrustee, of their respective interests in the claims on which the action was based or make it unnecessary to join them as plaintiffs therein.

Moreover, since notwithstanding the purport of the assignment, Elizabeth retained her 30 per cent interest in such claims, and Lynch, as cotrustee, retained his 30 per cent interest in such claims, and since Syms, Jr., sought to recover on their claims in the action, they would have been affected by any judgment entered and were indispensable parties to the action and it could not have been prosecuted properly in their absence.

When consideration is given to all the pertinent facts and circumstances bearing on the question, we think the finding of the trial court, set out above, is clearly erroneous, and that the real reason for the assignment was to make it unnecessary to join Elizabeth and Lynch, as cotrustee, as party plaintiffs, and thereby limit the parties to the action to persons who were citizens of different states, keeping in mind that when the assignment was executed and the instant action was instituted, Syms, Jr., believed Elizabeth was a citizen of Florida.

28 U.S.C.A. § 1359 reads:

"A district court shall not have jurisdiction of a civil action in which any party, by assignment or otherwise, has been improperly or collusively

made or joined to invoke the jurisdiction of such court."

Such section was enacted June 25, 1948. See 62 Stat. 935.

■ We now proceed to consider the adjudicated cases, to determine whether the assignment by Lynch, as cotrustee, of his interest as such trustee in such claims to Syms, individually, under the facts was improper within the meaning of that term in § 1359, supra.

Judge Homer Thornberry, in his opinion in Caribbean Mills, Inc. v. Kramer, 5 Cir., 392 F.2d 387, decided January 26, 1968, thoroughly and exhaustively considered the provisions of § 1359, supra, the preceding statutory enactments from which it was derived, and the adjudicated cases construing § 1359 and such preceding statutes. The facts in that case were these:

Caribbean Mills, Inc., was a corporation organized under the laws of Haiti, where it operated a flour mill. On May 30, 1959, it entered into a written contract with an individual named Kelly, of Washington, D. C., and the Panama Venezuela Finance Company, a corporation organized under the laws of Panama, by which Caribbean Mills agreed "to purchase from Panama 125 shares of corporate stock for a down payment of $85,000" and an additional $165,000, payable in 12 annual installments. No installment payments were ever made.

On September 21, 1964, Panama and Venezuela Finance Company and Kelly assigned their interest in the contract to Clayton Kramer, an attorney in Wichita Falls, Texas. The stated consideration was $1.00. By separate agreements executed on the same day, Kramer reassigned 95 per cent of the interest acquired by him by the assignment to Panama and Venezuela Finance Company. Thereafter, Kramer filed suit against Caribbean Mills for $165,000 in the United States District Court for the Northern District of Texas. The trial court overruled Caribbean Mills' motion to dismiss for want of jurisdiction. The trial, by jury, resulted in a verdict against Caribbean Mills for $165,000. Judgment was entered for that amount, and Caribbean Mills appealed.

After we have set out the enactments by Congress with respect to assignments made to create diversity jurisdiction, we shall further refer to the opinion in *Caribbean Mills* at length.

The various enactments by Congress since 1789, with respect to assignments made to create jurisdiction by a federal court, had their genesis in § 11 of the Judiciary Act of 1789, 1 Stat. 78. Section 11, in part here material, reads:

" * * * nor shall any district or circuit court have cognizance of any suit to recover the contents of any promissory note or other chose in action in favour of an assignee, unless the suit might have been prosecuted in such court to recover the said contents if no assignment had been made, except in cases of foreign bills of exchange * * *."

The Act of March 3, 1875, 18 Stat. 470, 472, in § 5, states in part:

"That if, in any suit commenced in a circuit court or removed from a State court to a circuit court of the United States, it shall appear to the satisfaction of said circuit court, * * that the parties to said suit have been improperly or collusively made or joined, either as plaintiffs or defendants, for the purpose of creating a case cognizable or removable under this act, the said circuit court shall proceed no further therein, but shall dismiss the suit or remand it to the court from which it was removed * * *."

The Act of March 3, 1887, 24 Stat. 552–555, was entitled:

"An act to amend the act of Congress approved March third, eighteen hundred and seventy-five, entitled 'An act to determine the jurisdiction of circuit courts of the United States, and to regulate the removal of causes from State courts, and for other purposes, and to further regulate the jurisdiction of circuit courts of the United States; and for other purposes.'"

Section 1 thereof, in part here material, reads:

"'* * * nor shall any circuit or district court have cognizance of any suit except upon foreign bills of exchange, to recover the contents of any promissary note or other chose in action in favor of any assignee, or of any subsequent holder of such instrument be payable to bearer and be not made by any corporation, unless such suit might have been prosecuted in such court to recover the said contents if no assignment or transfer had been made; * * *.'"

The Act of August 13, 1888, 25 Stat. 433, 434, was entitled:

"An act to correct the enrollment of an act approved March third, eighteen hundred and eighty-seven, entitled 'An act to amend sections one, two, three, and ten of an act to determine the jurisdiction of the circuit courts of the United States, and to regulate the removal of causes from the State courts, and for other purposes, approved March third, eighteen hundred and seventy-five.'"

Section 1 thereof reads in part:

"'* * * nor shall any circuit or district court have cognizance of any suit, except upon foreign bills of exchange, to recover the contents of any promissory note or other chose in action in favor of any assignee, or of any subsequent holder if such instrument be payable to bearer and be not made by any corporation, unless such suit might have been prosecuted in such court to recover the said contents if no assignment or transfer had been made; * * *.'"

Prior to the enactment of § 1359, supra, former § 41(1) of the Judicial Code

of 1911, from which § 1359 was partly derived, provided that no district court should "have cognizance of any suit (except upon foreign bills of exchange) to recover upon any promissory note or other chose in action in favor of any assignee, or of any subsquent holder if such instrument be payable to bearer and be not made by any corporation, unless such suit might have been prosecuted in such court to recover upon said note or other chose in action if no assignment had been made." (Reviser's Note, 28 U.S.C.A. § 1359.) [6]

The Act of 1875 as originally enacted, which required the dismissal or remand of cases, where the parties had been improperly or collusively made or joined for the purpose of creating a case cognizable by or removable to a federal court, was not superseded by the Act of 1887, as amended by the Act of 1888, referred to, supra.[7]

In its opinion in *Caribbean Mills*, the court stated:

"Broadly speaking, Section 11 of the Judiciary Act of 1789 denied federal jurisdiction to an assignee of a cause of action if it was unavailable to his assignor, i. e., if his assignor could not have brought the same suit in federal court. With changes in language, the 'assignee clause' remained a part of the law until 1948. Wright, Federal Courts § 31, at 85 (1963 ed.). Section 37 of the Judicial Code of 1911, which stemmed from the Act of 1875, commanded the dismissal or remand of an original or removed action when the parties had been 'improperly or collusively made or joined, either as plaintiffs or defendants, for the purpose of creating a case cognizable or removable.' 3 J. Moore, Federal Prac-

6. See also Caribbean Mills, Inc. v. Kramer, 5 Cir., 392 F.2d 387, 389 (1968); 3A Moore's Federal Practice ¶ 17.05[1] (1970 ed.).

7. Lehigh Mining & Manufacturing Co. v. Kelly, 160 U.S. 327, 16 S.Ct. 307, 40 L. Ed. 444 (1895);

See also Steigleder v. McQuesten, 198 U.S. 141, 25 S.Ct. 616, 49 L.Ed. 986 (1905);
Barney v. City of New York, 193 U.S. 430, 431, 24 S.Ct. 502, 48 L.Ed. 737 (1904);
Lake County Commissioners v. Dudley, 173 U.S. 243, 19 S.Ct. 398, 43 L.Ed. 684 (1899).

tice ¶ 17.05 at 1319 (1967 ed.). In the 1948 Judicial Code, the Reviser condensed these two sections into Section 1359, the statute we have today. The Reviser's Notes indicate that the purpose of condensing the two sections into one was twofold: To eliminate confusing and unnecessary exceptions to the assignee clause and to eliminate the effect of that clause on bona fide assignees. Under the original clause, a bona fide assignee could not sue in federal court unless his assignor could have; under Section 1359, any assignee can sue in federal court so long as he was not improperly or collusively made a party in order to invoke federal jurisdiction. The Reviser's Notes do not suggest any other change in law or policy." [8]

The court, in the opinion in *Caribbean Mills,* clearly demonstrated there was no other change of the law since the Act of March 3, 1875, and particularly of the provisions of the prior law prohibiting improper or collusive assignment or transfer for the purpose of creating a cause cognizable by a federal court.

We shall now turn to some of the decisions considered by the court in its opinion in *Caribbean Mills,* dealing with assignments or transfers.

In 1959, the judges of the Third Circuit, sitting en banc, rendered their decision in Corabi v. Auto Racing, Inc., 264 F.2d 784. The facts in that case were that the mother of a deceased son had been appointed administratrix of his estate. She petitioned the state court having jurisdiction of the administration of the estate for permission to resign as such administratrix. She stated that her reason for seeking leave to resign was to have that court appoint a citizen of another state as the administrator,

in order to create diversity of citizenship between the parties to a suit she desired to have instituted in a federal court to recover for the wrongful death of her son. The state court granted her request and appointed a citizen of another state as administrator of her son's estate. In an action brought by the new administrator for the wrongful death of the son, the en banc court held that the appointment of a citizen of another state to create diversity of citizenship was not improper or collusive, and was not proscribed by § 1359, supra. The basis for this decision was that court's construction of § 1359, as stated in the opinion.[9] Subsequent decisions followed the lead of the Corabi case in holding a party's actions not to be "improper" or "collusive" within the meaning of § 1359, even though the motive of the party's actions was to gain access to the federal courts, if the actions were lawful in themselves, such as by appointments of guardians or administrators.[10] Even suits involving dubious assignments were held not to be violative of the provisions of § 1359.[11]

The court, in *Caribbean Mills,* refused to follow the decision of the Third Circuit in *Corabi,* and particularly rejected its interpretation of the words "improper" or "collusive". The court said that the Third Circuit:

"*  *  * By focusing on the literal meanings of the two words, *  *  * virtually emasculated the statute; for it is doubtful that any of the cases under consideration reflect collusion in the sense of fraud or deceit, collusion with the opposing party, or impropriety in the sense of indecorum or indecency. Indeed, when litigants can achieve diversity by such simple devices as assignment to a nonresident collection agent or appointment of a

8.  392 F.2d 387, at 389.

9.  Corabi v. Auto Racing, Inc., 3 Cir., 264 F.2d 784, 788 (1959).

10.  Deposit Guaranty Bank & Trust Co. v. Burton, 6 Cir., 380 F.2d 346 (1967); Lang v. Elm City Construction Co., 2 Cir., 324 F.2d 235 (1963);

Todd County, Minn. v. Loegering, 8 Cir., 297 F.2d 470 (1961).

11.  Bradbury v. Dennis, 10 Cir., 310 F.2d 73 (1962), cert. denied 372 U.S. 928, 83 S.Ct. 874, 9 L.Ed.2d 733; City of Eufaula, Alabama v. Pappas, D.C. M.D.Ala., 213 F.Supp. 749 (1963).

nonresident administrator, it is hard to imagine why they would ever resort to fraud or deceit, actual impropriety, or collusion with the other side. If the statute is to have any utility, its meaning must be derived from the pre-revision statutes and cases, not from dictionary definitions of the individual words. In the context of Section 1359 and its predecessor statutes, the phrase 'improperly or collusively' means what the courts have said it means. Hence, an attempt to create federal jurisdiction by colorable assignment or other device without substance is 'improper or collusive' within the meaning of the statute. This principle is settled by pre-revision cases and remains the law today." [12]

Williams v. Nottawa, 104 U.S. 209, 26 L.Ed. 719, involved an action against a township in Michigan upon bonds payable to bearer. Williams, the plaintiff, sued on three of the bonds as owner, but the others sued on had been transferred to him for collection purposes by citizens of Michigan. The court held that the transfer of such other bonds was colorable, in the sense that it was never intended to change the ownership thereof, and was made only for the purpose of "creating a cause cognizable in the courts of the United States" and dismissed the action, because it contravened the provisions of the Act of March 3, 1875, which are set out above.

In Miller & Lux, Inc. v. East Side Canal & Irrigation Co., 211 U.S. 293, 29 S.Ct. 111, 53 L.Ed. 189, a California corporation caused a new corporation to be created in Nevada, to which it transferred all the property of the California corporation without a valuable consideration and on condition that all the capital stock of the new Nevada corporation should be issued to the California corporation, which remained in existence with full power, as the owner of such stock, to control the operations of the Nevada corporation.

In a suit brought in federal court by the Nevada corporation, as plaintiff, which the California corporation could not have brought because diversity of citizenship would not have been present, the Supreme Court held that the transfer was collusively made for the purpose of creating federal jurisdiction and therefor violated the Act of March 3, 1875. In the *Caribbean Mills* opinion, the court observed:

"* * * The reason jurisdiction failed was not that the California corporation made a transfer with the motive of getting into federal court but rather that the transfer was colorable, indeed a sham, and was undertaken in order to create federal jurisdiction. * * *" (392 F.2d 387, at 390.)

In *Caribbean Mills*, the court reversed the judgment and remanded the case, with directions to dismiss the action for want of jurisdiction.

The Supreme Court granted certiorari to review the decision of the Fifth Circuit in *Caribbean Mills*, presumably to resolve the conflict between the Fifth and Third Circuits. However, 12 days before the Supreme Court granted certiorari, the Third Circuit, again sitting en banc, in McSparran v. Weist, 402 F.2d 867 (1968), overruled *Corabi*.

The Supreme Court, in Kramer v. Caribbean Mills, Inc., 394 U.S. 823, 89 S.Ct. 1487, 23 L.Ed.2d 9 (1969), affirmed the decision of the Fifth Circuit in *Caribbean Mills*.[13]

---

12. See 392 F.2d 387, at 393.

13. In its opinion, the Supreme Court said: "Section 1359 has existed in its present form only since the 1948 revision of the Judicial Code. Prior to that time, the use of devices to create diversity was regulated by two federal statutes. The first, known as the 'assignee clause,' provided that, with certain exceptions not here relevant: "'No district court shall have cognizance of any suit . . . to recover upon any promissory note or chose in action in favor of any assignee, . . . unless such suit might have been prosecuted in such court . . . if no assignment had been made.' [28 U.S.C. § 41(1) (1940 ed.). The clause

We think the instant case falls clearly within the rationale of *Caribbean Mills* and the cases on which it relies, some of which we have discussed, and the decision of the Supreme Court affirming the Fifth Circuit decision in *Caribbean Mills*.

It follows that the sham assignment from Lynch, as cotrustee, of his share in 30 per cent of the claims on which the instant action is grounded to Syms, Jr., was improperly made to invoke the jurisdiction of the federal court, and contravenes the provisions of § 1359, supra.

Accordingly, the judgment is reversed and the cause remanded, with directions to the trial court to dismiss the action for want of jurisdiction.

## ADDENDUM

I have set forth in my opinion, solely as an expression of my personal views, the facts and my conclusions with respect to the character and effect of the purported assignment from Elizabeth to Syms, Jr., individually, of her 30 per cent interest in the claims on which the present action is predicated and in any recovery that might be had in such action, and the reasons testified to by Syms, Jr.,

for the making of such assignment, because of the following reasons:

(1) At the time the assignment was executed, May 13, 1969; at the time the instant action was commenced, December 8, 1969; and at the time Syms, Jr., gave his deposition, January 21, 1970, he and his counsel believed Elizabeth was a citizen of Florida, as shown by Syms, Jr.'s testimony in his deposition;

(2) Because Syms, Jr., believed at the time the instant action was commenced that joining Elizabeth as a party plaintiff would destroy diversity of jurisdiction;

(3) Because it is my view for the reasons stated in my opinion that such purported assignment by Elizabeth to Syms, Jr., was in fact a mere pretense and a sham and transferred none of Elizabeth's 30 per cent interest in such claims;

(4) And finally, because I think the facts, with respect to such purported assignment by Elizabeth and the unfounded reason testified to by Syms, Jr., therefor, throw light upon and characterize the entire transaction as a sham, and afford additional reasons for concluding that the purported assignment by Lynch,

first appeared as § 11 of the Judiciary Act of 1789, 1 Stat. 79.]

"The second pre-1948 statute, 28 U.S.C. § 80 (1940 ed.), [§ 5 of the Act of March 3, 1875, 18 Stat. 470] stated that a district court should dismiss an action whenever:

" 'it shall appear to the satisfaction of the . . . court . . . that such suit does not really and substantially involve a dispute or controversy properly within the jurisdiction of [the] court, or that the parties to said suit have been improperly or collusively made or joined . . . for the purpose of creating [federal jurisdiction].'

"As part of the 1948 revision, § 80 was amended to produce the present § 1359. The assignee clause was simultaneously repealed. The Reviser's Note describes the amended assignee clause as a ' "jumble of legislative jargon," ' and states that '[t]he revised section changes this clause by confining its application to cases wherein the assignment is improperly or collusively made . . . Furthermore, . . . the

original purpose of [the assignee] clause is better served by substantially following section 80.' That purpose was said to be 'to prevent the manufacture of Federal jurisdiction by the device of assignment.'

"Only a small number of cases decided under § 1359 have involved diversity jurisdiction based on assignments, and this Court has not considered the matter since the 1948 revision. Because the approach of the former assignee clause was to forbid the grounding of jurisdiction upon *any* assignment, regardless of its circumstances or purpose, decisions under that clause are of little assistance. However, decisions of this Court under the other predecessor statute, 28 U.S.C. § 80 (1940 ed.), [§ 5 of the Act of March 3, 1875, 18 Stat. 470] seem squarely in point. These decisions, together with the evident purpose of § 1359, lead us to conclude that the Court of Appeals was correct in finding that the assignment in question was 'improperly or collusively made.' "

as cotrustee, was improper under the provisions of 28 U.S.C.A. § 1359.

THORNBERRY, Circuit Judge (concurring specially):

I agree with Judge Phillips that jurisdiction based on diversity of citizenship does not exist in this case, but my reasons are somewhat different from his. In my opinion, the jurisdictional question can be answered without reference to the actual or supposed citizenship of Elizabeth Syms. I would hold simply that the "assignment" by Lynch to Syms, Jr., deprived the district court of diversity jurisdiction by reason of 28 U.S.C. § 1359.

In Caribbean Mills, Inc. v. Kramer, 5th Cir. 1968, 392 F.2d 387, aff'd, 394 U.S. 823, 89 S.Ct. 1487, 23 L.Ed.2d 9 (1969), we held that an assignment that did not divest the assignor of his interest in the recovery and that was made for the purpose of creating diversity of citizenship, was "improper or collusive" within the meaning of Section 1359. Both of these elements—lack of economic substance and improper motive—are present in the case at bar.

First, Syms, Jr., admittedly paid nothing for the assignment from Lynch; and he received nothing in return, for Lynch retained his full share of the 30% trustee's interest after the assignment. Of course, Syms, Jr., unlike Kramer, had an interest in the recovery prior to the execution of the assignment. He was thus no mere stranger to the cause of action. But this fact does not lend economic substance to a transaction that left Lynch's share of the possible recovery absolutely unchanged. Nor does it affect my conclusion that Syms, Jr. was "made" a party to the suit by means of the purported assignment, because the assignment was necessary to eliminate the interest of Lynch, whose presence would have destroyed "complete" diversity. Secondly, as Judge Phillip's opinion convincingly demonstrates, Lynch's purported assignment could have been motivated by nothing more than a desire to create diversity of citizenship.

In short, the assignment was a sham, and Syms, Jr. was a mere collection agent with respect to Lynch's share of the claim. If litigants were permitted to manufacture diversity by such a hollow device as this, then the requirement of complete diversity would be meaningless.

RONEY, Circuit Judge (dissenting):

I respectfully dissent. I would affirm the decision of the District Court.

It is necessary to find improper motive in the subject assignments in order to deprive the District Court of diversity jurisdiction. This is a finding of fact which should be made by the trial court. The trial court found that the assignments were motivated for reasons which were not improper and these findings are not clearly erroneous.

In the determination of the other issues raised on this appeal, I would affirm the District Court on the basis of its findings of fact and conclusions of law.

ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

PER CURIAM:

The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is Denied.